Nos. 13-3536 & 14-1374

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

_____

## GENEVA COLLEGE,

*Plaintiff-Appellee,*

v.

SYLVIA M. BURWELL, in her official capacity as Secretary of the United States Department of Health and Human Services, *et al.*,

*Defendants-Appellants.*

_____

On Appeal from the United States District Court for the
Western District of Pennsylvania
Case No. 2:12-cv-00207-JFC (Judge Joy Flowers Conti)

_____

## APPELLEE'S MOTION TO RECALL AND STAY MANDATE

_____

Appellee Geneva College respectfully moves this honorable Court to recall and stay its mandate pending the outcome of related proceedings at the Supreme Court regarding Justice Alito's April 15, 2015 order in *Zubik v. Burwell* (14A1065) recalling and staying the mandate pending receipt of a response and further order of the Supreme Court.

On February 11, 2015, this Court reversed the district court's grant of Appellee's motions for preliminary injunction. On March 30, 2015, the College

petitioned for rehearing and rehearing en banc. On April 13, 2015, this Court denied the College's petition. On April 15, 2015, this Court issued the mandate.

The instant appeals were consolidated on appeal with the Government's appeals in *Zubik v. Burwell* (No. 14-1377) and *Persico v. Burwell* (No. 14-1376). The Court's February 11, 2015, opinion disposed of all four appeals. On March 26, 2015, the *Zubik* and *Persico* appellees petitioned this Court for rehearing and rehearing en banc. This Court denied their petition on April 6, 2015. The *Zubik* and *Persico* appellees moved to stay issuance of the mandate on April 9, 2015. This Court denied that motion on April 15, 2015, and issued the mandate the same day.

On April 15, 2015, the *Zubik* and *Persico* appellees filed in the U.S. Supreme Court an emergency application to recall and stay the mandate or issue an injunction pending resolution of their forthcoming certiorari petition. (Ex. A) On April 15, 2015, Justice Alito ordered that the mandate was recalled and stayed pending receipt of a response from the Government and further order of the Circuit Justice or of the Court. (Ex. B) On April 16, 2015, this Court recalled the mandate in *Zubik* and *Persico*. (Ex. C)

On April 17, 2015, Geneva College submitted to the U.S. Supreme Court its own emergency application to recall and stay the mandate or issue an injunction pending resolution of its forthcoming certiorari petition. (Ex. D) On April 20,

2015, the Supreme Court instructed counsel for the College to first move this Court to recall and stay the mandate in the College's cases, citing Supreme Court Rule 23.3 and noting the recall of the mandate in *Zubik* and *Persico*.

In light of the foregoing, the College respectfully requests that this Court recall the mandate in Nos. 13-3536 and 14-1374 and stay re-issuance of the mandate.

Respectfully submitted on April 21, 2015,

/s/ Gregory S. Baylor
Gregory S. Baylor
Matthew S. Bowman
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road, NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774

Kevin H. Theriot
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(913) 685-8000

Bradley S. Tupi
David Mongillo
1500 One PPG Place
Pittsburgh, PA 15222
(412) 594-5545

*Attorneys for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

I hereby certify that that this motion complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font. I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. Rule 35(b)(2) because it does not exceed 20 pages, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii).

*/s/ Gregory S. Baylor*

Gregory S. Baylor

## CERTIFICATION OF BAR MEMEBERSHIP
## AND ELECTRONIC FILING

Per L.A.R. 46.1(e), I hereby certify to the following:

I, Gregory S. Baylor, am a member of the bar for the United States Court of Appeals for the Third Circuit, as of July 3, 2013.

The text of the electronic brief is identical to the text in any required paper copies.

The electronic document has been scanned for viruses using Adobe Acrobat X Pro (Version 10.0.0) and has been found to be virus-free.

*/s/ Gregory S. Baylor*

Gregory S. Baylor

## CERTIFICATE OF SERVICE

I herby certify that on April 21, 2015, I electronically filed the foregoing brief with the Clerk of this Court by using the appellate CM/ECF system and per L.A.R 35.2(a), no paper copies are required unless so directed by the Court. Opposing counsel and counsel for amici supporting Appellants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Gregory S. Baylor
Gregory S. Baylor

## INDEX OF EXHIBITS

*Zubik v. Burwell* Application to Justice Alito ......................................... Exhibit A

Justice Alito's Order Recalling Third Circuit Mandate ........................... Exhibit B

Third Circuit Order Recalling the Mandate ............................................ Exhibit C

*Geneva College v. Burwell* Application to Justice Alito (Proposed) .......... Exhibit D

# EXHIBIT A

**No. _____**

IN THE SUPREME COURT OF THE UNITED STATES

MOST REVEREND DAVID A. ZUBIK ET AL.;
MOST REVEREND LAWRENCE T. PERSICO, ET AL.

*Applicants,*

v.

SYLVIA MATHEWS BURWELL, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL.,

*Respondents,*

**Application from the U.S. Court of Appeals for the Third Circuit**

**(Nos. 14-1376 & 14-1377)**

**EMERGENCY APPLICATION TO RECALL AND STAY MANDATE OR ISSUE INJUNCTION PENDING RESOLUTION OF CERTIORARI PETITION**

PAUL M. POHL
*Counsel of Record*
JOHN D. GOETZ
LEON F. DEJULIUS, JR.
IRA M. KAROLL
ALISON M. KILMARTIN
MARY PAT STAHLER
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412)391-3939
pmpohl@jonesday.com

*Counsel for Applicants*

NOEL J. FRANCISCO
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

# PARTIES TO THE PROCEEDINGS

The Applicants are the following:

- The Most Reverend David A. Zubik is the Bishop of The Roman Catholic Diocese of Pittsburgh, and is the Trustee of The Roman Catholic Diocese of Pittsburgh, a Pennsylvania Charitable Trust. Bishop Zubik also acts as Chairman of the Membership Board of Catholic Charities of the Diocese of Pittsburgh, Inc ("Catholic Charities").

- The Roman Catholic Diocese of Pittsburgh provides pastoral care and spiritual guidance for approximately 700,000 Catholics across 6 counties in Southwestern Pennsylvania, while overseeing the mission of spiritual, educational, and social service to Catholics and non-Catholics throughout the region. The Diocese operates a self-insured health plan through the Catholic Benefits Trust and makes its health insurance plan available to the employees of its nonprofit religious affiliates, including Catholic Charities.

- Catholic Charities of the Diocese of Pittsburgh, Inc. is the primary social service agency of the Diocese of Pittsburgh. It serves approximately 81,000 needy, underserved, and underprivileged people in Southwestern Pennsylvania by providing adoption, counseling, safety net and stability services, health care for the uninsured, housing and homeless assistance, pregnancy and parenting support, and refugee and senior services. Catholic Charities is insured through the Diocese of Pittsburgh's Catholic Benefits Trust.

- The Most Reverend Lawrence T. Persico is the Bishop of the Roman Catholic Diocese of Erie, and is the Trustee of The Roman Catholic Diocese of Erie, a Charitable Trust. Bishop Persico also acts as Chairman of the Membership Boards of St. Martin Center, Inc. and Prince of Peace Center, Inc. Bishop Persico serves on the board of directors of Erie Catholic Preparatory School and has reserved powers in that role.

- The Roman Catholic Diocese of Erie provides pastoral care and spiritual guidance for 187,500 Catholics across 13 counties, while serving many Northwestern Pennsylvania residents, Catholic and non-Catholic, through schools and charitable programs such as its prison ministry, family ministry, disability ministry, and international Diocesan missions. The Diocese makes its self-insured health insurance plan available to the employees of its nonprofit religious

affiliates, including St. Martin Center, Inc., Prince of Peace Center, Inc., and Erie Catholic Preparatory School.

- <u>St. Martin Center, Inc.</u> is an affiliate nonprofit corporation of Catholic Charities of the Diocese of Erie, which has been providing individuals and families with resources to gain self-sufficiency for the last fifty years. The Diocese of Erie provides health insurance to St. Martin Center's employees.

- <u>Prince of Peace Center, Inc.</u> is an affiliate nonprofit corporation of Catholic Charities of the Diocese of Erie, which provides various social and self-sufficiency services to the needy in the greater Mercer County, Pennsylvania community. The Diocese of Erie provides health insurance to Prince of Peace Center's employees.

- <u>Erie Catholic Preparatory School</u> is an affiliate nonprofit corporation of The Roman Catholic Diocese of Erie, made up of the all-female Villa Maria Academy and the all-male Cathedral Preparatory School, provides a Christ-centered, co-institutional, college preparatory Catholic school in the Diocese of Erie serving approximately 870 students. The Diocese of Erie provides health insurance to Erie Catholic Preparatory School's employees.

The Respondents are the following:

- <u>The United States Department of Health and Human Services</u>

- <u>Sylvia Mathews Burwell</u> in her official capacity as Secretary of the United States Department of Health & Human Services

- <u>The United States Department of Labor</u>

- <u>Thomas E. Perez</u> in his official capacity as Secretary of the United States Department of Labor

- <u>The United States Department of the Treasury</u>

- <u>Jacob J. Lew</u> in his official capacity as Secretary of the United States Department of the Treasury

# RULE 29.6 STATEMENT

As required by Supreme Court Rule 29.6, Applicants hereby submit the following corporate-disclosure statement.

1.     No Applicant has a parent corporation.

2.     No publicly held corporation owns any portion of any of the Applicants, and none of the Applicants is a subsidiary or an affiliate of any publicly owned corporation.

Date: April 15, 2015

*/s/ Paul M. Pohl*
PAUL M. POHL
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone:   (412)391-3939

**TABLE OF CONTENTS**

Page

PARTIES TO THE PROCEEDINGS ................................................................ i

RULE 29.6 STATEMENT ............................................................................. iii

TABLE OF CONTENTS .............................................................................. iv

INDEX OF APPENDICES ............................................................................ vi

TABLE OF AUTHORITIES ......................................................................... vii

OPINIONS BELOW ..................................................................................... 3

JURISDICTIONAL STATEMENT ................................................................ 3

STATEMENT OF THE CASE ...................................................................... 4

A.  The Mandate Requiring The Objectionable Coverage ........................... 4

    1.  Religious and Secular Exemptions from the Mandate .............. 4

    2.  The "Accommodation" Requiring Religious Objectors To
        Act ......................................................................................... 5

B.  Applicants Serve Their Communities Consistent With Their
    Religious Beliefs .................................................................................. 8

C.  Procedural History ............................................................................. 10

    REASONS FOR GRANTING THE APPLICATION ............................ 11

I.  APPLICANTS HAVE A CLEAR RIGHT TO RELIEF UNDER RFRA
    OR, AT THE VERY LEAST, A "REASONABLE PROBABILITY" OF
    CERTIORARI AND A "FAIR PROSPECT" OF REVERSAL ...................... 12

A.  Reasonable Probability This Court Will Grant Certiorari ................. 12

B.  The Mandate Substantially Burdens Applicants' Exercise of
    Religion ............................................................................................... 14

    1.  Declining to Comply with the Accommodation Is a
        Protected Exercise of Religion ................................................ 16

    2.  The Mandate Places Substantial Pressure upon
        Applicants to Violate Their Religious Beliefs ........................ 20

    3.  The Third Circuit's Substantial-Burden Analysis Conflicts
        With This Court's Decision in Hobby Lobby .......................... 21

C.  The Mandate Cannot Survive Strict Scrutiny ................................... 26

    1.  The Mandate Does Not Further a Compelling
        Government Interest ............................................................... 26

**TABLE OF CONTENTS**
**(continued)**

Page

2.　The Mandate Is Not the Least Restrictive Means of Furthering the Government's Asserted Interests ...................... 31

II.　THE EQUITIES FAVOR RECALLING THE MANDATE OR, ALTERNATIVELY, AN INJUNCTION PENDING CERTIORARI ............. 35

III.　INJUNCTIVE RELIEF WOULD AID THIS COURT'S JURISDICTION ..... 38

CONCLUSION ............................................... 39

# INDEX OF APPENDICES

Appendix A:  Third Circuit Merits Opinion

Appendix B:  Order Denying Pet. for Rehearing and Rehearing En Banc

Appendix C:  Order Denying Mot. to Stay the Mandate and Order Issuing Mandate

Appendix D:  District Court Opinion

Appendix E:  District Court Order Granting Motion to Convert Preliminary
              Injunction to Permanent Injunction

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Archdiocese of St. Louis v. Burwell,*
No. 4:13-CV-2300, 2014 WL 2945859 (E.D. Mo. June 30, 2014) ......................... 14

*Ass'n of Christian Schs. Int'l v. Burwell,*
No. 14-1492 (10th Cir. Dec. 19, 2014) .................................................................. 14

*Ave Maria Found. v. Sebelius,*
991 F. Supp. 2d 957 (E.D. Mich. 2014) ................................................................ 14

*Ave Maria Sch. of Law v. Burwell,*
No. 2:13-cv-795, 2014 WL 5471054 (M.D. Fla. Oct 28, 2014) ............................. 14

*Ave Maria Univ. v. Burwell,*
No. 2:13-cv-630, 2014 WL 5471048 (M.D. Fla. Oct. 28, 2014) ............................ 14

*Awad v. Ziriax,*
670 F.3d 1111 (10th Cir. 2012) ............................................................................ 27

*Bowen v. Roy,*
476 U.S. 693 (1986) ............................................................................................. 24

*Brandt v. Burwell,*
No. 14-CV-0681, 2014 WL 2808910 (W.D. Pa. June 20, 2014) ........................... 14

*Brown v. Entm't Merchs. Ass'n,*
131 S. Ct. 2729 (2011) .......................................................................... 29, 30, 31

*Burwell v. Hobby Lobby Stores Inc.,*
134 S. Ct. 2751 (2014) ................................................................................*passim*

*Catholic Benefits Ass'n v. Sebelius,*
No. CIV-14-240-R, 2014 WL 2522357 (W.D. Okla. June 4, 2014) ....................... 14

*Catholic Charities Archdiocese of Phila. v. HHS,*
No. 14-3126 (3d Cir. Sept. 2, 2014) ..................................................................... 14

*Catholic Diocese of Beaumont v. Sebelius,*
10 F. Supp. 3d 725 (E.D. Tex. 2014) .................................................................... 14

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ............................................................................................. 27

*Colo. Christian Univ. v. Sebelius,*
  No. 13-CV-02105, 2014 WL 2804038 (D. Colo. June 20, 2014) ........................... 14

*Diocese of Cheyenne v. Burwell,*
  No. 14-8040 (10th Cir. June 30, 2014) ................................................... 14

*Diocese of Fort Wayne-S. Bend v. Sebelius,*
  988 F. Supp. 2d 958 (N.D. Ind. 2013) ................................................... 14

*Dobson v. Sebelius,*
  No. 13-cv-03326, 2014 WL 1571967 (D. Colo. Apr. 17, 2014) ............................. 14

*Dordt Coll. v. Sebelius,*
  No. C 13-4100, 2014 WL 2115252 (N.D. Iowa May 21, 2014) ............................. 14

*Dunn v. Blumstein,*
  405 U.S. 330 (1972) .................................................................... 31

*E. Tex. Baptist Univ. v. Sebelius,*
  988 F. Supp. 2d 743 (S.D. Tex. 2013).............................................. 14, 24

*Eternal World Television Network, Inc. v. HHS,*
  756 F.3d 1339 (11th Cir. 2014) ......................................................... 14

*Fifth Ave. Presbyterian Church v. City of N.Y.,*
  293 F.3d 570 (2d Cir. 2002).............................................................. 27

*FOCUS v. Sebelius,*
  No. 1:13-cv-03263 (D. Colo. Apr. 23, 2014) ............................................. 14

*Geneva Coll. v. Sebelius,*
  988 F. Supp. 2d 511 (W.D. Pa. 2013) ................................................... 28

*Gilardi v. HHS,*
  733 F.3d 1208 (D.C. Cir. 2013)...................................................... 26, 31

*Grace Schs. v. Sebelius,*
  988 F. Supp. 2d 935 (N.D. Ind. 2013) .................................................. 14

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.,*
  683 F.3d 539 (4th Cir. 2012) ........................................................... 27

*Hobby Lobby Stores, Inc. v. Sebelius,*
  723 F.3d 1114 (10th Cir. 2013) ........................................... 26, 28, 31, 37

*Holt v. Hobbs,*
  134 S. Ct. 635 (2013) .............................................................. 12, 38

*Holt v. Hobbs,*
    135 S. Ct. 853 (2015) ..................................................................*passim*

*Insight for Living Ministries v. Burwell,*
    No. 14-cv-00675, 2014 U.S. Dist. LEXIS 165228 (E.D. Tex. Nov. 25,
    2014) ............................................................................................ 14

*Korte v. Sebelius,*
    735 F.3d 654 (7th Cir. 2013) .......................................................*passim*

*La. College v. Sebelius,*
    No. 12-0463, 2014 U.S. Dist. LEXIS 113083 (W.D. La. Aug. 13,
    2014) ............................................................................................ 14

*Lawrence v. Chater,*
    516 U.S. 163 (1996) ...................................................................... 15

*Legatus v. Sebelius,*
    988 F. Supp. 2d 794 (E.D. Mich. 2013) ......................................... 14

*Lux v. Rodrigues,*
    561 U.S. 1306 (2010) .................................................................... 13

*Maryland v. King,*
    133 S. Ct. 1 (2012) ....................................................................... 11

*Newland v. Sebelius,*
    881 F. Supp. 2d 1287 (D. Colo. 2012) ........................................... 34

*Notre Dame v. Burwell,*
    135 S. Ct. 1528 (Mar. 9, 2015) ............................................ 2, 12, 14

*Notre Dame v. Sebelius,*
    743 F.3d 547 (7th Cir. 2014) .......................................................*passim*

*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft,*
    389 F.3d 973 (10th Cir. 2014) ......................................... 26, 28, 29, 37

*Reaching Souls Int'l, Inc. v. Sebelius,*
    No. 13-1092, 2013 WL 6804259 (W.D. Okla. Dec. 20, 2013) ................ 14

*Roman Catholic Archbishop of Wash. v. Sebelius,*
    19 F. Supp. 3d 48 (D.D.C. 2013) ..................................................... 7

*Roman Catholic Archdiocese of Atl. v. Sebelius,*
    No. 1:12-CV-03489, 2014 WL 1256373 (N.D. Ga. Mar. 26, 2014) ...................... 14

*Roman Catholic Archdiocese of N.Y. v. Sebelius*,
    987 F. Supp. 2d 232 (E.D.N.Y. 2013)........................................... 14, 34

*Roman Catholic Diocese of Fort Worth v. Sebelius*,
    No. 4:12-cv-314 (N.D. Tex. Dec. 31, 2013) ............................ 14

*S. Nazarene Univ. v. Sebelius*,
    No. Civ-13-1015-F, 2013 WL 6804265 (W.D. Okla. Dec. 23, 2013) .................... 14

*Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*,
    No. 2:12 cv-92, 2013 WL 6858588 (E.D. Mo. Dec. 30, 2013)............................... 14

*Sherbert v. Verner*,
    374 U.S. 398 (1963) ....................................................... 32

*Thomas v. Review Bd. of Ind. Employment Sec. Div.*,
    450 U.S. 707 (1981) ................................................... 15, 16

*United States v. Raines*,
    362 U.S. 17 (1960) ........................................................ 37

*United States v. U.S. Dist. Ct. for S. Dist. of N.Y.*,
    334 U.S. 258 (1948) ...................................................... 38

*Wheaton Coll. v. Burwell*,
    134 S. Ct. 2806 (2014) ..............................................*passim*

*Winter v. Natural Resources Defense Council*,
    555 U.S. 7 (2008). ........................................................ 2

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) .................................................. 16, 26

*Wise v. Lipscomb*,
    434 U.S. 1329 (1977) ..................................................... 11

*Zubik v. Sebelius*,
    983 F. Supp. 2d 576 (W.D. Pa. 2013) ..................................*passim*

## STATUTES

26 U.S.C. § 4980D(b).......................................................... 4

26 U.S.C. § 6033(a)(3)(A)(i) ................................................. 5

28 U.S.C. §§ 1254(1) and 2101(f)............................................. 3

28 U.S.C. § 1292(a)(1) ........................................................... 3

28 U.S.C. § 1331 .................................................................... 3

28 U.S.C 1651 ....................................................................... 13

28 U.S.C. § 2101(f) ............................................................... 11

42 U.S.C. § 300gg-13(a) ........................................................ 4

42 U.S.C. § 2000bb-1 ............................................................ 12

42 U.S.C. § 2000bb-1(b)(2) .................................................... 31

42 U.S.C. § 18011 ................................................................. 4

## OTHER AUTHORITIES

26 C.F.R. § 54.9815-1251T(g)(1)(v) ........................................ 4

26 C.F.R. § 54.9815-2713(a)(1)(iv) ......................................... 4

26 C.F.R. § 54.9815-2713A(a) ................................................ 6

26 C.F.R. § 54.9815-2713AT(b)-(c) ........................................ 25

29 C.F.R. § 2510.3-16(b) .................................................... 7, 8

29 C.F.R. § 2590.715-2713(a)(1)(iv) ....................................... 4

29 C.F.R. § 2590.715-2713A(d) .............................................. 7

45 C.F.R. § 147.130(a)(1)(iv) ................................................. 4

45 C.F.R. § 147.131(a) .......................................................... 5

45 C.F.R. § 147.131(c)(2)(i)(B) .............................................. 7

45 C.F.R. § 156.50 ................................................................ 8

75 Fed. Reg. 34,538 .............................................................. 5

75 Fed. Reg. 41,726 .............................................................. 29

76 Fed. Reg. 46,621 .............................................................. 5

77 Fed. Reg. 8725 ................................................................. 5

78 Fed. Reg. 39,870 ............................................................................ 5

78 Fed. Reg. 39,874 .......................................................................... 29

78 Fed. Reg. 39,879 ............................................................................ 7

78 Fed. Reg. 39,887 .......................................................................... 30

78 Fed. Reg. 39,888 .......................................................................... 33

78 Fed. Reg. 8456 ............................................................................... 5

79 Fed. Reg. 13,809 .......................................................................... 35

79 Fed. Reg. 51,092 ............................................................................ 6

79 Fed. Reg. 51,095 ............................................................................ 7

Fed. R. App. P. 41(b) .......................................................................... 3

Br. for the U.S. as Amicus Curiae, *Holt v. Hobbs*,
 No. 13-6827 (U.S. May 29, 2014), 2014 WL 2329778 .......................... 32

HRSA, Women's Preventive Services,
 http://www.hrsa.gov/womensguidelines (last visited April 9, 2015) .......... 4

Sup. Ct. R. 10(c) ............................................................................... 12

Sup. Ct. R. 23.1 ................................................................................ 11

Applicants seek an emergency recall and stay of the Third Circuit's mandate to keep in place the district court's permanent injunction and maintain the status quo while Applicants fully pursue certiorari before this Court. Alternatively, Applicants request injunctive relief pending their forthcoming petition for certiorari, or at the least, a temporary administrative stay to allow for full briefing on this Application. Without such relief, Applicants will today be forced by the Government to choose between violating their religious beliefs or potentially ruinous fines. This Court has already granted injunctive relief pending appeal to similar plaintiffs in *Wheaton* and *Little Sisters of the Poor*, and recall of the mandate pending resolution by this Court is appropriate.

Applicants are religious nonprofits whose sincerely-held religious beliefs prohibit them from providing, paying for, or facilitating access to abortifacients, contraception, and sterilization. Applicants hereby request emergency relief to prevent the Government from forcing them to comply with regulations requiring them to violate these beliefs. Specifically, the regulations would compel Applicants to (1) sign and submit the self-certification form designating and authorizing third parties to provide the objectionable coverage through Applicants' employee benefits plans, and (2) maintain a contractual relationship with those third parties, keeping open the conduit through which the objectionable products and services are delivered. Taking the required actions would violate Applicants' religious beliefs, and they will be subject to substantial penalties if they refuse.

On November 21, 2013, the United States District Court for the Western District of Pennsylvania granted Applicants' Motions for Preliminary Injunction, concluding—based on joint stipulations and witness credibility determinations—that Applicants had shown they were likely to succeed on the merits and otherwise satisfied the requirements set forth in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008). App. D.[1]  The district court later granted Applicants' Unopposed Motion to Convert the Preliminary Injunction to a Permanent Injunction, based in part on the Government conceding that it had no additional evidence. App. E.  On February 11, 2015, despite this Court's decision in *Burwell v. Hobby Lobby Stores Inc.*, 134 S. Ct. 2751, (2014), and order in *Wheaton Coll. v. Burwell*, 134 S. Ct. 2806 (2014) (mem.), a panel of the Third Circuit reversed the district court, holding that Applicants did not show a likelihood of success on the merits of their claim under the Religious Freedom Restoration Act (RFRA). App. A.  On March 9, 2015, this Court granted certiorari, vacated, and remanded the decision in *Notre Dame v. Sebelius*, 743 F.3d 547 (7th Cir. 2014).  *Notre Dame v. Burwell*, 135 S. Ct. 1528 (Mar 9, 2015).  Yet, on April 6, 2015, the court below denied *en banc* review, App. B, even though its decision was heavily rooted in the now vacated reasoning of the Seventh Circuit.  And today, April 15, 2015, the Third Circuit denied Applicants' motion to stay its mandate.  App. C.  Though Federal Rule of Appellate Procedure 41(b) indicates that mandates will typically issue "7 days after entry of an order denying

---

[1] The injunction was entered after a two day evidentiary hearing at which six witnesses testified.  Extensive stipulations and exhibits were entered.  This case, thus, presents a well-developed record.

a timely . . . motion for stay of mandate," Fed. R. App. P. 41(b), the Court issued its mandate immediately. App. C. Consequently, absent relief from this Court, Applicants will today be forced to choose between violating their religious beliefs or incurring substantial fines.

In order to prevent this irreparable harm, Applicants request that this Court recall the Third Circuit's mandate. This would allow the district court's injunction to remain in place. Alternatively, Applicants request that this Court grant an injunction pending consideration of Applicants' forthcoming petition for certiorari. At a minimum, Applicants request that this Court issue a temporary administrative stay to allow for full consideration and briefing of this Application before the challenged regulations can be enforced. *See, e.g., Wheaton*, 134 S. Ct. 2898; *Little Sisters of the Poor*, 134 S. Ct. 893 (2013) (Sotomayor, J., in chambers).

## OPINIONS BELOW

The district court's opinion granting Applicants' preliminary injunctive relief is attached as Appendix D and its order converting the preliminary injunction to a permanent injunction is attached as Appendix E. The Third Circuit's merits opinion is attached as Appendix A, its denial of Applicants' petition for rehearing is attached as Appendix B, and its denial of Applicants' motion to stay the mandate is attached as Appendix C.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. § 1331, and the Court of Appeals had jurisdiction under 28 U.S.C. § 1292(a)(1). This Court has jurisdiction under 28 U.S.C. §§ 1254(1) and 2101(f).

## STATEMENT OF THE CASE

### A.    The Mandate Requiring The Objectionable Coverage

Under the Affordable Care Act ("ACA"), 42 U.S.C. § 300gg-13(a)(4), the Government promulgated a Mandate requiring group health plans and the insurers of fully-insured group health plans to cover "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity," HRSA, Women's Preventive Services, http://www.hrsa.gov/womensguidelines (last visited April 9, 2015); *see* 26 C.F.R. § 54.9815-2713(a)(1)(iv); 29 C.F.R. § 2590.715-2713(a)(1)(iv); 45 C.F.R. § 147.130(a)(1)(iv). The third-party administrator (TPA) of a self-insured plan has no statutory obligation to provide such coverage. 42 U.S.C. § 300gg-13(a). FDA-approved contraceptive methods and sterilization procedures include intrauterine devices (IUDs), the morning-after pill (Plan B), and Ulipristal (Ella), all of which can—according to Applicants' sincerely-held religious beliefs—induce an abortion. *Hobby Lobby*, 134 S.Ct. at 2762-63 n.7. If an employer's health plan does not include the required coverage, the employer is subject to penalties of $100 per day per affected beneficiary. 26 U.S.C. § 4980D(b). Dropping employee health coverage likewise subjects employers with more than fifty employees to penalties of $2,000 per year per employee after the first thirty employees. *Id.* § 4980H(a), (c)(1).

### 1.    Religious and Secular Exemptions from the Mandate

From its inception, the Mandate exempted numerous health plans covering millions of people. For example, certain pre-existing plans are "grandfathered" and exempt from the Mandate. 42 U.S.C. § 18011; 26 C.F.R. § 54.9815-1251T(g)(1)(v).

Indeed, as of the end of 2013, by the Government's own estimates, over 90 million individuals participated in health plans excluded from the scope of the Mandate. 75 Fed. Reg. 34,538, 34,552-53 (June 17, 2010).

Acknowledging the burden the Mandate places on religious exercise, the Government also created a narrow exemption for plans sponsored by so-called "religious employers," which include "churches, their integrated auxiliaries, and conventions or associations of churches" under 26 U.S.C. § 6033(a)(3)(A)(i). 45 C.F.R. § 147.131(a). Those entities are allowed to offer employee health coverage that does not violate their religious beliefs. But that narrow exemption protects only "the unique relationship between a house of worship and its employees in ministerial positions." 76 Fed. Reg. 46,621, 46,623 (Aug. 3, 2011); *see also* 77 Fed. Reg. 8725, 8727-28, 8730 (Feb. 15, 2012); 45 C.F.R. § 147.131(a); 78 Fed. Reg. 8456, 8461 (Feb. 6, 2013). For other religious entities, such as Applicants Catholic Charities, St. Martin Center, Price of Peace Center, and Erie Catholic Preparatory School, and for churches that provide coverage to the employees of certain religious affiliates, there is no exemption.[2]

---

[2] This new definition of religious employer, which gives an exemption to houses of worship, but not other religious organizations that operate as part of the exercise of the Catholic faith, was found to be impermissible by the district court. *Zubik v. Sebelius*, 983 F. Supp. 2d 576, 606-08 (W.D. Pa. 2013). It is one of the only district court cases to address that issue, which is yet another reason to grant the requested relief.

### 2. The "Accommodation" Requiring Religious Objectors To Act

Instead, the Government has relegated other equally-religious entities to an inaptly named "accommodation." 78 Fed. Reg. 39,870, 39,871 (July 2, 2013). Unlike the exemption, the accommodation does not allow religious objectors to provide employee health coverage without violating their religious beliefs. Instead it forces self-insured objectors, such as the Applicants here, to take specific action to authorize and designate a TPA to provide the objectionable coverage through the objectors' employee health plan. If such objectors do not take this action, their plans and TPAs cannot provide the objectionable coverage to their employees.

To be eligible for the "accommodation," a self-insured entity must (1) "oppose[] providing coverage for some or all of [the] contraceptive services"; (2) be "organized and operate[] as a nonprofit entity"; (3) "hold[] itself out as a religious organization"; and (4) self-certify that it meets the first three criteria. 26 C.F.R. § 54.9815-2713A(a). If a self-insured organization meets these criteria and wishes to avail itself of the accommodation, it must provide a "self-certification" to its TPA, *id.* § 54.9815-2713A(a)(4).[3]

---

[3] After this Court temporarily enjoined enforcement of the accommodation in *Wheaton*, the Government revised its regulations yet again. 79 Fed. Reg. 51,092 (Aug. 27, 2014). Under the revised regulations, objecting religious nonprofits may choose to submit a new "notice" to the federal government containing their health plan information, which creates the same legal obligations and incentives for their TPA to provide contraceptive benefits as the self-certification form. *Id.* at 51,094-95. This superficial revision does not remove the burden on Applicants' religious exercise. Applicants must still maintain a contractual relationship with a third party authorized to deliver the mandated coverage to their plan beneficiaries, and Applicants must still submit a document that they believe wrongfully facilitates the

The Government requires Applicants to take specific actions to enable the Government to commandeer their health plans for the delivery of the objectionable coverage. If a self-insured "eligible organization" submits the self-certification form, its TPA is authorized to arrange "payments for contraceptive services" for beneficiaries enrolled in the organization's health plan. *See id.* § 54.9815-2713A(a)-(c). Payments for the objectionable coverage are available only "so long as [beneficiaries] are enrolled in [the organization's] health plan." 29 C.F.R. § 2590.715-2713A(d); 45 C.F.R. § 147.131(c)(2)(i)(B).

The certification authorizes, obligates, and incentivizes Applicants' TPA to provide the objectionable coverage. The self-certification form "designat[es] . . . the [organization's TPA] as plan administrator and claims administrator for contraceptive benefits." 78 Fed. Reg. at 39,879. Because "'[i]n the self-insured [context], technically, the contraceptive coverage is part of the [self-insured organization's health] plan,'" *Roman Catholic Archbishop of Wash. v. Sebelius* ("*RCAW*"), 19 F. Supp. 3d 48, 80 (D.D.C. 2013) (citation omitted) (alterations in

---

delivery of such coverage. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 & n.3 (1993) (regulatory changes do not moot suit where "gravamen of [the] complaint" remains, and new rule "disadvantages [plaintiffs] in the same fundamental way").

Moreover, despite the Government's claims to the contrary, the new notification is not "consistent with" the notice in *Wheaton*. 75 Fed. Reg. at 51,094. Most obviously, the *Wheaton* notice did not trigger regulatory authority and incentives for the plaintiff's TPA to provide the objectionable coverage. Rather, upon filing the *Wheaton* notice, the plaintiff and its private insurance arrangement became fully exempt. 134 S. Ct. at 2807. Nor did the *Wheaton* notice require plaintiffs to include information such as "the name and contact information for [their TPAs] and health insurance issuers," 79 Fed. Reg. at 51,095—information that serves no purpose but to facilitate what Applicants believe to be an immoral regulatory scheme.

original), without the form, a TPA has no obligation or authorization to provide the contraceptive coverage.   29 C.F.R. § 2510.3-16(b)(1), (b)(2) (the signed self-certification requires that the TPA "shall be responsible for," *inter alia*, "providing contraceptive coverage that complies with" the Mandate); *see also RCAW*, 19 F. Supp. 3d at 79 ("the [TPA's] obligation to provide contraceptive coverage arises only if it receives a copy of the self-certification"); 29 C.F.R. § 2510.3-16(b) (the certification to the TPA is the "instrument under which the plan is operated").  The accommodation, moreover, incentivizes TPAs to provide the mandated coverage by reimbursing them for 115% of the full cost of coverage—but only if the organization first provides its TPA with the mandated self-certification.  *See* 45 C.F.R. § 156.50.

## B.    Applicants Serve Their Communities Consistent With Their Religious Beliefs

Applicants are nonprofit religious organizations in Western Pennsylvania that provide a range of spiritual, charitable, educational, and social services to members of their communities, Catholic and non-Catholic alike.   As entities affiliated with the Catholic Church, Applicants sincerely believe that life begins at the moment of conception, and that certain "preventive" services that interfere with conception or terminate a pregnancy are immoral.  *Zubik*, 983 F. Supp. 2d at, 590-91, 594, 599-600.  Applicants adhere to the Catholic doctrines regarding material cooperation with evil and "scandal."[4]  *Id.* at 594.  Accordingly, they believe they may not provide, pay for, and/or facilitate access to contraception, sterilization, abortion,

---

[4] "Scandal" involves leading, by words or actions, other persons to engage in wrongdoing.  *See* Catechism of the Catholic Church ¶ 2284.

or related counseling.  *Id.*  In particular, Applicants' religious beliefs prohibit them from signing a form or letter that authorizes or designates their TPA to provide their plan beneficiaries with coverage for abortifacients, contraceptives, and sterilization, all of which are prohibited by their religious beliefs.  *Id.* at 594-95. Applicants believe that signing such a form or letter facilitates moral evil.  *Id.* at 594, 605.  This is true whether or not Applicants pay for the objectionable coverage. The Government stipulated to the sincerity of all of Applicants' articulated beliefs. JA152 ¶¶ 52-56 (stipulating to the *Persico* declarations); JA160 ¶¶ 114-17 (stipulating to the *Zubik* declarations).

Historically, Applicants have exercised their religious beliefs by offering health coverage in a manner consistent with Catholic teaching.  *Zubik*, 983 F. Supp. 2d at 591-94 (describing the Dioceses' historical provision of health insurance in accordance with Catholic beliefs).  In particular, they have contracted with TPAs that would provide health coverage consistent with their religious beliefs to their plan beneficiaries.  Under the Government's regulations, when Applicants sign the self-certification form, under the guise of an accommodation based on religious objection, the carefully structured provisions of their insurance policies change: their TPAs for the first time are authorized to deliver the objectionable coverage to the insureds of the religious objector, through Applicants' health plans.

This affects all of the Applicants.  Despite their religious missions, the Applicants that are not Dioceses do not qualify as exempt "religious employers" under the Government's definition.  Even the Dioceses, which qualify as "religious

employers," are not truly exempt because they offer their health plans to the employees of their non-exempt charitable and educational affiliates. The regulations require the Dioceses' health plans to provide objectionable coverage to enrolled affiliates' employees.

## C.    Procedural History

To protect their rights of religious exercise, the Applicants separately filed suits on October 8, 2013. On November 12 and 13, 2013, the district court held an evidentiary hearing where it admitted 172 joint stipulations, testimony from six witnesses including one Roman Catholic Cardinal and two Bishops, and 64 exhibits, of which the Government proffered only nine unique exhibits. On November 21, 2013, the district court issued an opinion addressing both cases and granting a preliminary injunction on behalf of all Applicants. On December 20, 2013, the district court converted that preliminary injunction into a permanent injunction because, *inter alia*, the Government admitted that it had no additional evidence. On February 11, 2014, the Government appealed to the Third Circuit.

On February 24, 2014, the Third Circuit consolidated the Government's appeals of the Applicants' cases. Then, on April 2, 2014, at the Government's request, the Third Circuit further consolidated these appeals with the Government's appeals in two similar cases. *See Geneva College v. Sec'y U.S. Dep't of Health & Human Servs.*, Nos. 13-3536, 14-1374 (3d Cir.). On February 11, 2015, a panel of the Third Circuit reversed the district court's grant of injunctive relief. Applicants timely sought panel rehearing and rehearing *en banc*, but their petition was denied on April 6, 2015. On April 9, 2015, Applicants moved to stay the Third Circuit's

issuance of its mandate pending disposition of their petition for certiorari, which the court denied on April 15, 2015. Notwithstanding Federal Rule of Appellate Procedure 41(b), it then immediately issued its mandate. Thus, absent relief from this Court, Applicants will be forced to violate their sincerely-held religious beliefs or face massive fines.

### REASONS FOR GRANTING THE APPLICATION

Supreme Court Rule 23.1 provides that "[a] stay may be granted by a Justice as permitted by law." An individual Justice is authorized to issue a stay of a judgment or decree "for a reasonable time to enable the party aggrieved to obtain a writ of certiorari from the Supreme Court." 28 U.S.C. § 2101(f).

An individual Justice is authorized to stay the lower court's mandate when there is "(1) 'a reasonable probability' that this Court will grant certiorari, (2) 'a fair prospect' that the Court will then reverse the decision below, and (3) 'a likelihood that irreparable harm [will] result from the denial of a stay.'" *Maryland v. King*, 133 S. Ct. 1, 2 (2012) (Roberts, C.J., in chambers). The same standard applies if the Circuit Justice must order the mandate recalled before staying it. *E.g.*, *Wise v. Lipscomb*, 434 U.S. 1329, 1333-34 (1977) (Powell, J., in chambers).

Likewise, an individual Justice is authorized to issue an injunction in exigent circumstances when the legal rights at issue are "indisputably clear," and when such relief is "necessary or appropriate in aid of [this Court's] jurisdiction[]." 28 U.S.C. § 1651(a); *Lux v. Rodrigues*, 561 U.S. 1306, 1307 (2010) (Roberts, C.J., in chambers) (citation omitted); *Wis. Right to Life, Inc. v. Fed. Election Comm'n*, 542

U.S. 1305, 1306 (2004) (Rehnquist, C.J., in chambers) (citations omitted).

For the reasons described below, Applicants meet the standard for recalling the mandate, or alternatively, injunctive relief.

## I. APPLICANTS HAVE A CLEAR RIGHT TO RELIEF UNDER RFRA OR, AT THE VERY LEAST, A "REASONABLE PROBABILITY" OF CERTIORARI AND A "FAIR PROSPECT" OF REVERSAL

RFRA prohibits the Government from imposing a "substantial[] burden" on Applicants' exercise of religion unless the Government shows that such a burden is the "least restrictive means" of advancing a "compelling governmental interest." 42 U.S.C. § 2000bb-1. As discussed below, the Government's regulations violate RFRA and the opinion below contradicts this Court's analysis and reasoning in its recent decisions in *Hobby Lobby* and *Holt v. Hobbs*, 135 S. Ct. 853 (2015). As a result, there is a "reasonable probability" that this Court will grant Applicants' forthcoming certiorari petition and a "fair prospect" of reversal.

### A. Reasonable Probability This Court Will Grant Certiorari

There is a "reasonable probability" that this Court will grant certiorari. This case presents an "important" issue affecting thousands of nonprofit religious groups and, as explained below, the decision below plainly "conflicts with relevant decisions of this Court." Sup. Ct. R. 10(c). On three occasions in recent months, this Court has granted injunctive relief—extraordinary relief compared to the relief Applicants are seeking here—to protect religious believers from imminent and irreparable harm. *See Wheaton*, 134 S. Ct. 2806 (mem.); *Little Sisters*, 134 S. Ct. 1022 (mem.); *Holt v. Hobbs*, 134 S. Ct. 635 (2013) (mem.) (temporary enjoining a prison grooming policy requiring prisoner to violate his religious beliefs). And, recently, in *Notre*

*Dame v. Burwell*, 135 S. Ct. 1528 (Mar 9, 2015), this Court granted certiorari, vacated, and remanded the decision in *Notre Dame v. Sebelius*, 743 F.3d 547 (7th Cir. 2014), for reconsideration in light of *Hobby Lobby*.

The requested relief is particularly appropriate in light of *Wheaton* and *Little Sisters*, where this Court granted injunctions pending appeal to applicants with similar religious objections to the accommodation. *Wheaton*, 134 S. Ct. 2806; *Little Sisters*, 134 S. Ct. 1022. In *Wheaton* and *Little Sisters*, the applicants sought and were granted injunctive relief under the higher standard required by the All Writs Act, 28 U.S.C 1651. *See, e.g.*, *Lux v. Rodrigues*, 561 U.S. 1306, 1307 (2010) (Roberts, C.J., in chambers) ("an applicant must demonstrate that the legal rights at issue are 'indisputably clear.'").

Relief is even more appropriate here. A district court's permanent injunction is already in place and Applicants are respectfully seeking recall of the Third Circuit's mandate. Moreover, Applicants, like in *Wheaton* and *Little Sisters*, are nonprofit religious entities that object to taking actions that they believe make them complicit in the delivery of objectionable coverage to their employees. And just as in *Wheaton* and *Little Sisters*, the Government's regulations force Applicants to choose between taking actions that violate their religious beliefs or suffering severe penalties. Thus, the same reasons that prompted this Court's intervention in those cases warrant similar relief under the lower standard here.

There are dozens of similar cases involving hundreds of plaintiffs currently pending in the district courts and Courts of Appeals. Applicants here are the only

ones currently exposed to millions of dollars in fines for exercising their faith. The equities strongly favor preserving the status quo and protecting Applicants' religious exercise pending resolution of their petition for certiorari. Indeed, that is why enforcement of the Mandate has been enjoined in nearly thirty cases considering the Mandate's application to nonprofit entities like Applicants.[5]

---

[5] *See Wheaton*, 134 S. Ct. 2806; *Little Sisters*, 134 S. Ct. 1022; *Ass'n of Christian Schs. Int'l v. Burwell*, No. 14-1492 (10th Cir. Dec. 19, 2014) (Doc. 14); *Catholic Charities Archdiocese of Phila. v. HHS*, No. 14-3126 (3d Cir. Sept. 2, 2014); *Eternal World Television Network, Inc. v. HHS* ("*EWTN*"), 756 F.3d 1339 (11th Cir. 2014); *Diocese of Cheyenne v. Burwell*, No. 14-8040 (10th Cir. June 30, 2014) (Doc. 27); *Insight for Living Ministries v. Burwell*, No. 14-cv-00675, 2014 U.S. Dist. LEXIS 165228 (E.D. Tex. Nov. 25, 2014); *Ave Maria Univ. v. Burwell*, No. 2:13-cv-630, 2014 WL 5471048 (M.D. Fla. Oct. 28, 2014); *Ave Maria Sch. of Law v. Burwell*, No. 2:13-cv-795, 2014 WL 5471054 (M.D. Fla. Oct 28, 2014); *La. College v. Sebelius*, No. 12-0463, 2014 U.S. Dist. LEXIS 113083 (W.D. La. Aug. 13, 2014); *Archdiocese of St. Louis v. Burwell*, No. 4:13-CV-2300, 2014 WL 2945859 (E.D. Mo. June 30, 2014); *Brandt v. Burwell*, No. 14-CV-0681, 2014 WL 2808910 (W.D. Pa. June 20, 2014); *Colo. Christian Univ. v. Sebelius*, No. 13-CV-02105, 2014 WL 2804038 (D. Colo. June 20, 2014); *Catholic Benefits Ass'n v. Sebelius*, No. CIV-14-240-R, 2014 WL 2522357 (W.D. Okla. June 4, 2014); *Dordt Coll. v. Sebelius*, No. C 13-4100, 2014 WL 2115252 (N.D. Iowa May 21, 2014); *FOCUS v. Sebelius*, No. 1:13-cv-03263 (D. Colo. Apr. 23, 2014) (Docs. 39, 40); *Dobson v. Sebelius*, No. 13-cv-03326, 2014 WL 1571967 (D. Colo. Apr. 17, 2014); *Roman Catholic Archdiocese of Atl. v. Sebelius*, No. 1:12-CV-03489, 2014 WL 1256373 (N.D. Ga. Mar. 26, 2014); *Ave Maria Found. v. Sebelius*, 991 F. Supp. 2d 957 (E.D. Mich. 2014); *Catholic Diocese of Beaumont v. Sebelius*, 10 F. Supp. 3d 725 (E.D. Tex. 2014); *Roman Catholic Diocese of Fort Worth v. Sebelius*, No. 4:12-cv-314 (N.D. Tex. Dec. 31, 2013) (Doc. 99); *Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Servs.*, No. 2:12 cv-92, 2013 WL 6858588 (E.D. Mo. Dec. 30, 2013); *Diocese of Fort Wayne-S. Bend v. Sebelius*, 988 F. Supp. 2d 958 (N.D. Ind. 2013); *Grace Schs. v. Sebelius*, 988 F. Supp. 2d 935 (N.D. Ind. 2013); *E. Tex. Baptist Univ. v. Sebelius*, 988 F. Supp. 2d 743 (S.D. Tex. 2013); *S. Nazarene Univ. v. Sebelius*, No. Civ-13-1015-F, 2013 WL 6804265 (W.D. Okla. Dec. 23, 2013); *Reaching Souls Int'l, Inc. v. Sebelius*, No. 13-1092, 2013 WL 6804259 (W.D. Okla. Dec. 20, 2013); *Legatus v. Sebelius*, 988 F. Supp. 2d 794 (E.D. Mich. 2013); *Roman Catholic Archdiocese of N.Y. v. Sebelius*, 987 F. Supp. 2d 232 (E.D.N.Y. 2013).

## B.     The Mandate Substantially Burdens Applicants' Exercise of Religion

This Court is likely to reverse the Third Circuit. This Court recently granted certiorari, vacated, and remanded the decision in *Notre Dame v. Sebelius*, 743 F.3d 547 (7th Cir. 2014), for reconsideration in light of *Hobby Lobby*. *Notre Dame v. Burwell*, 135 S. Ct. 1528 (Mar 9, 2015). In GVR-ing the *Notre Dame* decision, this Court necessarily found a "reasonable probability that [*Notre Dame*] rest[ed] upon a premise that the lower court would reject if given the opportunity for further consideration." *Lawrence v. Chater*, 516 U.S. 163, 167 (1996). Because the Third Circuit's decision here is explicitly rooted in *Notre Dame*'s reasoning, there is a reasonable probability that it too will be deemed contrary to *Hobby Lobby*.

When, as here, a claimant's sincerity is not in dispute, RFRA's substantial burden test involves a straightforward, two-part inquiry: a substantial burden arises when the Government "demands" that entities either (1) "engage in conduct that seriously violates their religious beliefs" or else (2) suffer "substantial" "consequences" *Hobby Lobby*, 134 S. Ct. at 2775-76; *Holt*, 135 S. Ct. at 862.

Under the first step, the court's inquiry is necessarily limited to accepting the sincere beliefs as credibly stated. After all, it is not "within the judicial function" to determine whether a belief or practice is in accord with a particular faith. *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 716 (1981). Courts must thus accept a plaintiff's description of its religious exercise, regardless of whether the court, or the Government, finds the beliefs to be "acceptable, logical, consistent, or comprehensible." *Id.* at 714; *Hobby Lobby*, 134 S. Ct. at 2777-78 (rejecting the

Government's "attenuat[ion]" argument as "dodg[ing] the question that RFRA presents"). In other words, it is left to the plaintiff to "dr[a]w a line" regarding the actions his religion deems permissible, and once that line is drawn, "it is not for [a court] to say [it is] an unreasonable one." *Thomas*, 450 U.S. at 715. Instead, a court's "'narrow function . . . in this context is to determine' whether the line drawn reflects 'an honest conviction.'" *Hobby Lobby*, 134 S. Ct. at 2779 (citation omitted).

Under the second step, the court "evaluates the coercive effect of the governmental pressure on the adherent's religious practice. . . ." *Korte v. Sebelius*, 735 F.3d 654, 683 (7th Cir. 2013). In short, it looks to the "sever[ity]" of the "consequences" of noncompliance. *Hobby Lobby*, 134 S. Ct. at 2775. Specifically, it must determine whether the Government is compelling an individual to "perform acts undeniably at odds" with his beliefs, *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972), by putting "substantial pressure on [him] to modify his behavior and to violate his beliefs," *Thomas*, 450 U.S. at 718.

For the reasons discussed below, it is clear that the regulations at issue here substantially burden Applicants' religious exercise and, therefore, there is a "fair prospect of reversal."

### 1. Declining to Comply with the Accommodation Is a Protected Exercise of Religion

*Hobby Lobby* confirms that the "exercise of religion" "involves 'not only belief and profession but the performance of (or abstention from) physical acts' that are 'engaged in for religious reasons.'" 134 S. Ct. at 2770 (citation omitted). Significantly, RFRA protects "'*any* exercise of religion, whether or not compelled by,

or central to, a system of religious belief'" and "mandat[es] that this concept 'be construed in favor of broad protection of religious exercise.'" *Id.* at 2762 (quoting 42 U.S.C. §§ 2000cc-3(g), 2000cc-5(7)(A)) (emphasis added); *Holt*, 135 S. Ct. at 862 (same).

Here, part of the exercise of religion by Applicants is "abst[aining] from" at least two specific "acts" required by the regulations. *First*, Applicants object to submitting the self-certification required under the accommodation because of what is caused by that action. Two Bishops—as Plaintiffs and the final arbiters of religious matters for the other Plaintiffs—testified unequivocally that they cannot sign the self-certification form required by the accommodation, because doing so would violate their faith, as "the facilitation of evil." JA565:1-8 (Bishop Persico); JA522:2-9 (Bishop Zubik); *see also* JA199-200 (Cardinal Dolan); *Zubik*, 983 F. Supp. 2d at 594-95, 599-600 (District Court finding). It is undisputed that, by signing the self-certification form, Applicants authorize and designate their TPAs to provide the morally objectionable coverage and allow their health plans to be used as a vehicle to bring about a morally objectionable wrong. JA379-80 ¶ 13; JA380 ¶ 14. Although "it takes a few minutes to sign" the self-certification form, "the ramifications are eternal." JA566:24-25 (Bishop Persico); *Zubik*, 983 F. Supp. 2d at 594-95 (District Court finding). Indeed, without the signed form, Applicants' TPAs cannot provide the coverage, as the Government stipulated. JA401¶ 25; JA442¶ 22) ("[w]ithout the self-certification form, the TPA is prohibited from providing coverage for the objectionable services to [the Affiliates'] employees."). The Government

stipulated to these beliefs, did not challenge their sincerity, and the District Court found them credible. JA152 ¶¶ 52-56 (stipulating to beliefs of the Persico plaintiffs); JA160 ¶¶ 114-17 (stipulating to beliefs of the Zubik plaintiffs); *Zubik*, 983 F. Supp. 2d at 599-600 (District Court finding).

In this respect, the self-certification puts Applicants in a situation akin to that faced by German Catholics in the 1990s. At the time, Germany allowed certain abortions only if the mother obtained a certificate that she had received state-mandated counseling. If the mother decided to abort her child, she had to present the certificate from her counselor to her doctor as a prerequisite. Pope John Paul II concluded that Church representatives could not act as counselors in this regulatory scheme, even where they counseled against abortion, because "the certification issued by the churches was a necessary condition for abortion." *EWTN*, 756 F.3d at 1343 (Pryor, J., concurring).

*Second*, Applicants likewise object to complying with the accommodation because it would require them to maintain a contractual relationship with a third party that is obligated, authorized, and incentivized to provide contraceptive coverage to the beneficiaries enrolled in Applicants' health plans. Among other things, this would include providing their TPAs with the names of employees and beneficiaries of non-exempt affiliate entities to allow the objectionable coverage to be provided as part of their health plans. JA520:17-19 (Bishop Zubik); *Zubik*, 983 F. Supp. 2d at 583-84 n.10, 605 (District Court) ("After providing the signed self-certification, the Dioceses would be obliged to provide the TPA with the names of

individuals insured through the Diocesan health plan who are employees of non-exempt entities . . . .").

By way of illustration, the regulations here are akin to a law requiring all schools, on pain of substantial fines, to offer free lunches to their students. If ham sandwiches were required to be on the menu, such a law could substantially burden the religious exercise of a Kosher school. And the burden would remain even if the Government offered an "accommodation" whereby the school's lunch vendor paid for and served the sandwiches. In that scenario, the school may well object to its forced participation in the lunch program—namely, to the fact that it would have to hire and maintain a relationship with a vendor that would serve non-kosher food to its students in its facilities—even though it would not be placing the sandwiches on the students' plates. The same is true here. It makes no difference whether Applicants must pay for the contraceptive coverage; what matters is that, in their religious judgment, it would be immoral for them to contract with a vendor that will provide the offending coverage to their plan beneficiaries.

There should be no dispute that Applicants' religious objections—refusing to sign and submit the objectionable form or maintain the objectionable contractual relationship—fall well within the scope of religious exercise protected by RFRA. These are clearly "physical acts" from which Applicants believe they must "abst[ain]" "for religious reasons." *Hobby Lobby*, 134 S. Ct. at 2770 (citation omitted). While these actions are different from the specific actions compelled in *Hobby Lobby*, that distinction is irrelevant because RFRA protects "'*any* exercise of religion.'" *Id.* at

2762 (emphasis added) (citation omitted). What matters is that *Applicants* "believe" the actions "demanded by the HHS regulations [are] connected to" illicit conduct "in a way that is sufficient to make it immoral for them to" take those actions. *Id.* at 2778. Applicants have "dr[a]w[n]" a "line" "between [actions] consistent with [their] religious beliefs" and actions they "f[i]nd morally objectionable." *Id.* It is not for a court to disagree. *Id.* (quoting *Thomas*, 450 U.S. at 715).

### 2. The Mandate Places Substantial Pressure upon Applicants to Violate Their Religious Beliefs

In *Hobby Lobby*, this Court held that the Mandate substantially burdened the plaintiffs' exercise of religion because "the economic consequences [would] be severe" if the plaintiffs "[did] not yield" to the Government's "demand[] that they engage in conduct that seriously violates their religious beliefs." 134 S. Ct. at 2775. The Court noted that the plaintiffs "object[ed] on religious grounds" to complying with the regulations, and proceeded to ask whether the plaintiffs would incur a substantial *penalty* if they did not comply. *Id.* at 2775-79. Because that penalty, millions of dollars in fines, "[was] surely substantial," the Court found a "substantial burden" on the plaintiffs' exercise of religion. *Id.* at 2776, 2779; *see also Holt*, 135 S. Ct. at 862 (petitioner "easily satisfied" the substantial burden standard where he was "put[s] . . . to this choice" of violating his religious beliefs or suffering "serious disciplinary action").

Here, Applicants face the same "consequences" for noncompliance as the plaintiffs in *Hobby Lobby*. 134 S. Ct. at 2776. Just as in *Hobby Lobby*, failure to comply with the regulations at issue subjects Applicants to potentially ruinous fines

of $100 a day per affected beneficiary. *See id.* at 2775 (citing 26 U.S.C. § 4980D).

And just as in *Hobby Lobby*, if Applicants drop their health plans, they are subject to incurring fines of $2,000 a year per full-time employee after the first thirty employees and/or ruinous practical consequences due to their inability to offer a healthcare benefit to employees. *See id.* at 2776 (citing 26 U.S.C. § 4980H).

Moreover, Applicants' provision of health coverage is itself an exercise of religion, motivated by Catholic social teaching, and dropping coverage would therefore inhibit Applicants' ability to exercise their religion. *See Hobby Lobby*, 134 S. Ct. at 2776 (the option of dropping coverage "entirely ignores the fact that the [plaintiffs] have religious reasons for providing health-insurance coverage."); *id.* at 2777 ("We doubt that the Congress that enacted RFRA—or, for that matter, ACA—would have believed it a tolerable result to put [plaintiffs] to the choice of violating their sincerely held religious beliefs or making all of their employees lose their existing healthcare plans."). After *Hobby Lobby*, "these consequences" of non-compliance clearly "amount to a substantial burden" on religious exercise. *Id.* at 2759.

### 3. The Third Circuit's Substantial-Burden Analysis Conflicts With This Court's Decision in *Hobby Lobby*

The Third Circuit's substantial burden analysis cannot be reconciled with *Hobby Lobby* and this Court's precedent. Rather than assessing the substantiality of the *penalty* threatened by the Government to compel Applicants to act in violation of their religious beliefs, the Third Circuit devoted its analysis to assessing the nature of the *actions* Applicants are compelled to take. The Third Circuit's holding, that the Mandate is <u>not</u> a burden at all on Applicants' free exercise of

religion, is based heavily on the vacated *Notre Dame* decision and its progeny as well as the discredited dissent in *Korte*. Op. at 44 (citing *Notre Dame*, 743 F.3d at 551, 557; *Korte*, 735 F.3d at 705 (Rovner, J., dissenting)). This analysis was improper for at least four separate but related reasons.

*First*, the panel rested its decision on an improper "qualitative assessment" of "whether [Applicants'] compliance with the self-certification procedure does, in fact, trigger, facilitate, or make them complicit in the provision of contraceptive coverage." Op. at 44 (citing the *Korte* dissent). After conducting that inquiry, the court concluded that "the submission of the self-certification form does not make [Applicants] 'complicit' in the provision of contraceptive coverage," and indeed "relieves [Applicants'] of any connection" to such conduct.

*Hobby Lobby* squarely rejected such analysis, explaining that it:

> dodges the question that RFRA presents (whether the HHS mandate imposes a substantial burden on the ability of the objecting parties to conduct business in accordance with *their religious beliefs*) and instead addresses a very different question that the federal courts have no business addressing (whether the religious belief asserted in a RFRA case is reasonable).

134 S. Ct. at 2778. In other words, *Hobby Lobby* commands that Applicants, not courts, determine whether an act "is connected" to illicit conduct "in a way that is sufficient to make it immoral." *Id.* Here, it is undisputed that Applicants believe they cannot sign the self-certification form, and cannot participate in the accommodation, because doing so facilitates and authorizes the provision of the objectionable coverage. *See* JA379-80 ¶ 13; JA380 ¶ 14. In the face of this undisputed evidence, it was manifest error for the Third Circuit to substitute its

religious judgment for that of Applicants in order to proclaim that the compliance with the accommodation does not make Applicants "complicit" in a moral evil or, indeed, require them to take "any action that interferes with [their] religious activities." Op. at 37.

*Second*, the Third Circuit concluded that the accommodation amounts to an "opt out" that "relieves [Applicants] of any obligation to . . . arrange . . . for access to contraception." Op. at 43 (citing *Priests for Life*, 772 F.3d at 252). In doing so, the Third Circuit decided for itself that signing the form allows Applicants to "wash[] [their] hands of any involvement in contraceptive coverage." Op. at 44 (citing *Notre Dame*, 743 F.3d at 557). The determination of complicity in wrongdoing, however, is itself a religious judgment rooted in Catholic teachings regarding material cooperation and "scandal." *Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 566 (7th Cir. 2014) (Flaum, J., dissenting) (objection based not on principles "of legal causation but of religious faith"). As *Hobby Lobby* confirms, courts may not "[a]rrogat[e]" unto themselves "the authority" to "answer" the "religious and philosophical question" of "the circumstances under which it is wrong for a person to perform an act that is innocent in itself but that has the effect of enabling or facilitating the commission of an immoral act by another." 134 S. Ct. at 2778. Here, Applicants have concluded that the accommodation simply offers them a different way to violate their religious beliefs. That is no more of an "opt out" than allowing a religious pacifist to choose between military service and working in a munitions factory when his beliefs forbid him from both.

*Third*, the Third Circuit's re-characterization of Applicants' religious objections inaccurately treated them as objections to third parties' conduct. Op. at 43. On the contrary, the record is clear, and the Government stipulated that Applicants object to actions they are required to take thereby authorizing or designating a TPA to provide the objectionable coverage through Applicants' plans. *See* JA379-80 ¶ 13; JA380 ¶ 14; *Zubik*, 983 F. Supp. 2d at 594-95 (District Court finding); *E. Tex. Baptist Univ. v. Sebelius*, 988 F. Supp. 2d 743, 765 (S.D. Tex. 2013) (plaintiffs "vigorously object on religious grounds to the act[s] that the government requires *them* to perform, not merely to later acts by third parties.") (emphasis added). Among other things, Applicants have repeatedly reiterated their objection to signing the form that designates or authorizes their TPA to provide the objectionable coverage through their plan. *Supra* pp. 14-16.

Based on this error, the Third Circuit cited an inapposite line of cases dealing with objections solely to third parties' conduct, without any conduct by the objector. Op. at 40-43 (citing *Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008) (government extraction of DNA from blood sample in its possession); *Bowen v. Roy*, 476 U.S. 693 (1986) (government use of Social Security number in its possession); *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988) (government building road on public land)). Unlike those cases, this case does not involve a situation where Applicants play "no role." *Kaemmerling*, 553 F.3d at 679. Significantly, when the *Bowen* Court considered the plaintiffs' objection to an action they were required to take—transmitting their daughter's social security number to

the government—"'five justices . . . expressed the view that the plaintiffs '[would have been] entitled to an exemption' from [that] 'administrative requirement.'" *Notre Dame*, 743 F.3d at 566 (Flaum, J., dissenting).

*Fourth*, the Third Circuit's decision rests in part on the premise that Applicants' TPAs have an "independent obligation" to provide the objectionable coverage to Applicants' employees. Op. at 39. This is wrong. Applicants' TPAs have no independent obligation to provide the objectionable coverage *unless and until* Applicants sign and submit the self-certification form. It is undisputed and stipulated that "[w]ithout the self-certification form, the TPA is prohibited from providing coverage for the objectionable services to [the Affiliates'] employees." JA401¶ 25; JA442¶ 22); *see, e.g.*, 26 C.F.R. § 54.9815-2713AT(b)-(c) (obligations arise only "[w]hen" and "[i]f" an objector offers a health plan, contracts with an insurer or TPA, and provides the notification). Because the Diocesan plans specifically exclude the objectionable coverage and do not allow the TPAs to provide such coverage, *see, e.g.*, JA388-89¶ 9; JA428¶ 7, the TPAs have no legal authority to provide it; a TPA can provide only the coverage that the plan administrator has deemed appropriate. *See* John C. Garner, Health Insurance Answer Book Q 10:50 (11th ed. 2013 ("[L]egally the TPA is just a paper pusher. All power and responsibility rest with the official 'plan administrator,' which is usually the sponsoring employer or a board of trustees of the plan."). A TPA "bears the legal obligation to provide contraceptive coverage *only* upon receipt of a valid self-certification." *Wheaton*, 134 S. Ct. at 2814 n.6 (Sotomayor, J., dissenting) (emphasis

added).  Indeed, the Government admitted that here.  *See, e.g.*, JA160 ¶ 117; JA401 ¶ 25.

### C.  The Mandate Cannot Survive Strict Scrutiny

Because the Third Circuit erroneously found the accommodation does not impose a burden, let alone a substantial one, it did not consider whether the accommodation survives strict scrutiny.  Op. at 48-49.  But, because the accommodation *does* substantially burden Applicants' exercise of religion, the "burden is placed squarely on the Government" to show that it satisfies strict scrutiny.  *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 429 (2006).  *Hobby Lobby*, *Holt*, and several other decisions confirm that the Government cannot meet this demanding standard.  *See, e.g.*, *Korte*, 735 F.3d at 685-87; *Gilardi v. HHS*, 733 F.3d 1208, 1219-24 (D.C. Cir. 2013); *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1143 (10th Cir. 2013) (en banc); *supra* n. 5.

### 1.  The Mandate Does Not Further a Compelling Government Interest

Under RFRA, the Government must "demonstrate that the compelling interest test is satisfied through application of the challenged law [to] the particular claimant whose sincere exercise of religion is being substantially burdened."  *Hobby Lobby*, 134 S. Ct. at 2779 (citation omitted); *Holt*, 135 S. Ct. at 863 (same).  "[B]roadly formulated" or "sweeping" interests are inadequate.  *O Centro*, 546 U.S. at 431; *Yoder*, 406 U.S. at 221.  Rather, the Government must show with "particularity how [even] admittedly strong interest[s]" "would be adversely affected by granting an exemption."  *Id.* at 236.  In other words, a court must "look to the

marginal interest in enforcing the contraceptive mandate in th[is] case[]." *Hobby Lobby*, 134 S. Ct. at 2779. Here, a review of the evidence in this record—as opposed to generalized policy claims that were not presented in the record—shows that the Government has failed to establish a compelling interest for at least four reasons.

*First*, in the district court, the Government asserted only "two compelling governmental interests" in defense of the Mandate: "the promotion of public health" and "assuring that women have equal access to health care services."[6] *Zubik*, 983 F. Supp. 2d at 609. But *Hobby Lobby* rejected these "very broadly framed" interests, noting that RFRA "contemplates a 'more focused' inquiry." 134 S. Ct. at 2779. Indeed, "[b]y stating the public interests so generally, the government guarantee[d] that the mandate will flunk the test." *Korte*, 735 F.3d at 686.[7]

---

[6] On appeal, the Government for the first time asserted two new compelling interests: "its ability to operate programs while accommodating religious concerns" and "ensuring a comprehensive insurance system with a variety of benefits available to all participants." Gov. 3d Cir. Br. at 29-30 (citing *U.S. v. Lee*, 455 U.S. 252, 258 (1982)). The Government waived these allegedly "compelling" interests by not raising them at the district court. *See, e.g.*, *Fifth Ave. Presbyterian Church v. City of N.Y.*, 293 F.3d 570, 576 (2d Cir. 2002) (appellate court need not consider a compelling interest the government first proffered on appeal). In any event, these interests, like the ones asserted before the district court, are overly broad and not specific to Applicants. Further, the Government offered no evidence to support these new interests, and it therefore cannot establish them because it failed to provide any "evidence of a concrete problem." *Awad v. Ziriax*, 670 F.3d 1111, 1130 (10th Cir. 2012); *see also Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.*, 683 F.3d 539, 556-7 (4th Cir. 2012) (Government cannot succeed if "the record establishes, at most, only . . . speculative evidence").

[7] The district court, similarly to *Hobby Lobby* and *Korte*, correctly held that the Government's two asserted interests were too "broadly stated . . . [to] overbalance legitimate claims to the free exercise of religion." *Zubik*, 983 F. Supp. 2d at 609 (quoting *Yoder*, 406 U.S. at 215).

*Second*, "a law cannot be regarded as protecting an interest of the highest order" "when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) (citation omitted); *O Centro*, 546 U.S. at 433. As of the end of 2013, the Government exempted health plans covering 90 million employees through a variety of exemptions, including those for grandfathered plans. *Korte*, 735 F.3d at 683; *Geneva Coll.*, 941 F. Supp. 2d at 684 & n.12. And the Government has stipulated in this case that approximately 100 million people are on grandfathered health plans that can remain exempt from the preventive services requirement in perpetuity. JA482 ¶¶ 5-6. Simply put, "the interest here cannot be compelling because the [regulations] presently do[] not apply to tens of millions of people." *Hobby Lobby*, 723 F.3d at 1143; *Korte*, 735 F.3d at 686; *see also Holt*, 135 S. Ct. at 865-66.

The Government's interest also cannot be compelling because it exempted its narrow class of "religious employers" without any—let alone a compelling—basis to deny a similar exemption for Applicants, who are equally religious. *See supra* pp. 4-5. If there is, in the eyes of the Government, no compelling interest in applying the Mandate to religious employers operating houses of worship, there cannot be a compelling interest to apply the Mandate to religious employers operating the Church's charitable and educational counterparts. *See Zubik*, 983 F. Supp. 2d at 610. Indeed, the Government stipulated that worship, good works, and education are all equally essential to the Catholic faith and "cannot be separated," JA382 ¶ 21;

JA404-05 ¶ 37; JA413-14 ¶ 18; JA422 ¶ 19; JA443 ¶ 28, even though the regulations at issue attempt to limit the free exercise of religion to just what occurs in houses of worship. Thus, "[e]verything the Government says about" exempt religious employers "applies in equal measure to" non-exempt religious non-profits like Applicants, and therefore "it is difficult to see how" the Government can "preclude any consideration of a similar exception for" Applicants. *O Centro*, 546 U.S. at 433. The Government has no justification for "distinguishing between different religious believers—burdening one while [exempting] the other—when it may treat both equally by offering both of them the same [exemption]." *Hobby Lobby*, 134 S. Ct. at 2786 (Kennedy, J., concurring).

In an attempt to justify treating equally valid religious entities differently, the Government has asserted, without evidence, that religious nonprofits such as Applicants that do not qualify as "religious employers" do not merit an exemption because their employees are less likely to object to contraceptives. 78 Fed. Reg. at 39,874; JA682:13-JA683:13. But, as the district court found, this claim is "speculative, and unsubstantiated by the record and, therefore, unpersuasive." *Zubik*, 983 F. Supp. 2d at 610. Moreover, this claim is directly contradicted by the record. For example, all Diocese of Pittsburgh employees, including all Catholic Charities employees, make an annual pledge to perform their duties in accordance with Catholic teaching. JA548:22-JA549:2.

*Third*, at best, the Mandate would only "[f]ill[]" a "modest gap" in contraceptive coverage. *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2741 (2011).

The Government has acknowledged that contraceptives are widely available at free and reduced cost through various government programs, and are also covered by "over 85 percent of employer-sponsored health insurance plans." 75 Fed. Reg. 41,726, 41,732 (July 19, 2010). In such circumstances, with contraceptives so readily available to practically anyone who wants them, the Government has not "identif[ied] an 'actual problem' in need of solving." *Brown*, 131 S. Ct. at 2738 (citation omitted). After all, the Government "does not have a compelling interest in each marginal percentage point by which its goals are advanced." *Id.* at 2741 n.9.

*Finally*, RFRA requires the Government to identify a compelling need for enforcement against the "particular claimant[s]" filing suit, not among the general population. *Hobby Lobby*, 134 S. Ct. at 2779. The Government fails to make this showing and instead relies on the general proposition that "women who receive their health coverage through employers *like [Applicants]* would face negative health and other outcomes . . . ." *Zubik*, 983 F. Supp. 2d at 610 (district court opinion); 77 Fed. Reg. at 8728; 78 Fed. Reg. at 39,887. As a factual matter, the district court found that the Government "failed to offer any testimony or other evidence . . . to support [its] claim" that Applicants' employees have suffered, or will suffer, "any 'negative health or other outcomes' without the enforcement of the contraceptive mandate." *Zubik*, 983 F. Supp. 2d at 610. The district court found "the evidence was to the contrary." *Id.* Indeed, Applicants are not aware of any employee complaints regarding the absence of the objectionable coverage. JA540:18-25; JA578:24-JA579:7; JA596:23-JA597:12. Nor is there any record

evidence that Applicants' employees have suffered, or will suffer, any negative health effects. JA541:1-5; JA579:8-11.

Simply put, no evidence establishes a significant lack of access among Applicants' plan beneficiaries or that the Mandate would significantly increase contraception use among those individuals. Since the Government provides no evidence on these points—and admitted it had no further evidence—it cannot show that enforcing the Mandate here is "actually necessary" to achieve its aims. *Brown*, 131 S. Ct. at 2738.

To be clear, the Government's failure to "satisfy the . . . compelling interest standard[]" does not preclude this Court from "recogniz[ing] the importance of [the asserted] interests." *Hobby Lobby*, 723 F.3d at 1143. The fact that an interest is not compelling does not make it unimportant or insignificant—it merely means that it does not justify overriding the congressional concern for religious liberty embodied in RFRA. *Gilardi*, 733 F.3d at 1221 ("[Interests] underpinning the mandate can be variously described as legitimate, substantial, perhaps even important, but [they do] not rank as compelling, and that makes all the difference.").

### 2. The Mandate Is Not the Least Restrictive Means of Furthering the Government's Asserted Interests

The Government must also show that its regulations are "the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1(b)(2). Under that "exceptionally demanding" test, *Hobby Lobby*, 134 S. Ct. at 2780, "if there are other, reasonable ways to achieve those [interests] with a lesser burden on constitutionally protected activity, [the Government] may not

choose the way of greater interference. If it acts at all, it must choose 'less drastic means.'" *Dunn v. Blumstein*, 405 U.S. 330, 343 (1972); *Holt*, 135 S. Ct. at 864 (same). A regulation is the least restrictive means only if "no alternative forms of regulation would [accomplish the compelling interest] without infringing [religious exercise] rights." *Sherbert v. Verner*, 374 U.S. 398, 407 (1963).

The *Government* bears the burden of proof here. As the Solicitor General recently explained in the analogous RLUIPA context, the Government cannot satisfy its burden through "unsubstantiated statement[s]." Br. for the U.S. as Amicus Curiae at 17, *Holt v. Hobbs*, No. 13-6827 (U.S. May 29, 2014), 2014 WL 2329778. Rather, it must "offer evidence—usually in the form of affidavits from [government] officials—explaining how the imposition of an identified substantial burden furthers a compelling government interest and why it is the least restrictive means of doing so, with reference to the circumstances presented by the individual case." *Id*. Such "explanation[s must] relate to the specific accommodation the plaintiff seeks"; where a plaintiff "identifies [acceptable] less restrictive alternatives," the Government must "demonstrate that they have considered and rejected the efficacy of those alternatives." *Id.* at 18. In short, to prevail, the Government must rely on *evidence* that the accommodation is the only feasible way to distribute cost-free contraceptives to women employed by religious objectors. *Holt*, 135 S. Ct. at 864 (the government must "not merely explain" its exemption denial, but must "prove that denying the exemption is the least restrictive means of furthering a compelling governmental interest").

The Government has not come close to meeting this burden. The district court correctly found that the Government "failed to present any credible evidence tending to prove" that the accommodation is the least restrictive means of advancing its stated interests. *Zubik*, 983 F. Supp. 2d at 612. The Government exclusively relied on one page in the Federal Register, *see* JA686:12-JA689:15, that simply states "various alternatives . . . were considered" but would not be "feasible" or "as effective[]." 78 Fed. Reg. at 39,888. There were no affidavits or any evidence that would demonstrate why it cannot grant an exemption for these Applicants. Under this Court's precedent, simply stating that other means are less effective, without evidence of robust and serious consideration, is not enough. *See Holt*, 135 S. Ct. at 864.

Moreover, "[t]here are many ways to promote public health and gender equality, almost all of them less burdensome on religious liberty" than using religious objectors' health plans as a conduit to deliver free contraception. *Korte*, 735 F.3d at 686. Most obviously, as explained in *Hobby Lobby*, "[t]he most straightforward way of doing this would be for the Government to assume the cost of providing the . . . contraceptives at issue to any women who are unable to obtain them under their health-insurance policies due to their employers' religious objections." 134 S. Ct. at 2780. The Government, however, chose to ignore this alternative—despite Applicants making this very argument since the beginning of this case, *Zubik*, No. 2:13-cv-1459, Doc. No. 6 at 30—and never presented any evidence that it would be cost-prohibitive to do so.

The Government could provide free contraceptive coverage without using Applicants' plans as a conduit in numerous ways: it "could provide the contraceptives services or insurance coverage directly to [Applicants'] employees, or work with third parties—be it insurers, health care providers, drug manufactures, or non-profits—to do so without requiring [Applicants'] active participation. It could also provide tax incentives to consumers or producers of contraceptive products." *Roman Catholic Archdiocese of New York v. Sebelius*, 987 F. Supp. 2d 232, 255-56 (E.D.N.Y. 2013); *Korte*, 735 F.3d at 686 (same). This could be accomplished through the vast federal machinery that already exists for providing health care subsidies on a massive scale—whether by adjusting the eligibility requirements of the Title X family planning program or any number of other programs that already provide cost-free contraceptives to women. *Cf. Newland v. Sebelius*, 881 F. Supp. 2d 1287, 1299 (D. Colo. 2012). Indeed, the Government has recently established a network of insurance exchanges under the ACA, and nothing prevents the Government from permitting employees of religious objectors to purchase fully subsidized coverage (either for contraceptives alone, or full plans) on those exchanges. While Applicants oppose many of these alternatives on policy grounds, all of them are "less restrictive" than the "accommodation" because they would deliver free contraception without forcing Applicants to violate their beliefs.

The Government has not even attempted to show why these "alternative[s]" are not "viable." *Hobby Lobby*, 134 S. Ct. at 2780. It has submitted no evidence to show that its interests would be negatively impacted by extending the religious

employer exemption to Applicants. And even had the Government attempted to shoulder its burden, it would not be able to meet this test. Absent evidence to substantiate its claims, the Government cannot claim that the cost of providing coverage—which likely "would be minor when compared with the overall cost of ACA"—would be prohibitive. *Hobby Lobby*, 134 S. Ct. at 2781. Indeed, the Government is already paying for this coverage as it will reimburse TPAs 115% of the costs under the accommodation. 79 Fed. Reg. at 13,809.

Finally, any suggestion that *Hobby Lobby* endorsed the Accommodation as a viable least-restrictive means in all cases is mistaken. In fact, this Court expressly did "not decide" that question. 134 S. Ct. at 2782 & n.40; *id*. at 2763 n.9. Instead, it simply found the accommodation *less* restrictive than requiring plaintiffs to pay for contraceptives where the plaintiffs *did not object* to the accommodation. *Id*. at 2782 & n.40; *id*. at 2786 (Kennedy, J., concurring). While the accommodation may "effectively exempt[]" such plaintiffs, *id*. at 2763 (majority op.), it does not "effectively" exempt Applicants, who do object to compliance. As this Court stated in *Hobby Lobby*, this Court "[did] not decide . . . whether an approach of this type complies with RFRA for purposes of all religious claims." *Id.* at 2782. Moreover, this Court's order in *Wheaton* dispelled any notion that *Hobby Lobby* somehow blessed the accommodation.

## II. THE EQUITIES FAVOR RECALLING THE MANDATE OR, ALTERNATIVELY, AN INJUNCTION PENDING CERTIORARI

The equities here also favor recall or an injunction. *First*, if relief is denied, Applicants will suffer irreparable harm because they will be forced to choose

between paying potentially ruinous fines and violating their religious beliefs. Whichever course they choose, they and the communities they serve will suffer damage that cannot be undone.

Applicants believe their signing of the form would impermissibly authorize or designate their TPAs to provide the objectionable coverage. Doing so would make Applicants complicit in sin. JA565:1-8 (Bishop Persico); JA522:2-9 (Bishop Zubik); *see also* JA199-200 (Cardinal Dolan); *Zubik*, 983 F. Supp. 2d at 594-95, 599-600 (District Court finding). By signing the form, Applicants authorize and designate their TPAs to provide the morally objectionable coverage and allow their health plans to be used as a vehicle to bring about a morally objectionable wrong. JA379-80 ¶ 13; JA380 ¶ 14; *see also* Appellees' Br. at 30-32.

After the mandate issues, if Applicants do not act as required by the accommodation, they can either keep their current plans and be subject to fines of $100 a day per affected beneficiary, *see* Op. at 24; JA151¶ 50(a); JA484¶ 13 (citing 26 U.S.C. § 4980(b)), or they can drop coverage altogether, violating Catholic social teaching and facing potentially ruinous consequences, including potential annual fines. *See, e.g.,* Op. at 22 n.8 ("We recognize that the appellees believe providing health insurance to their employees . . . is part of their religious commitments."). Thus, absent recall of the Third Circuit's mandate, Applicants will have to undertake specific actions that make them complicit in conduct that they believe to be immoral.

*Second*, the irreparable harm to Applicants far outweighs any harm to the

Government, which has gone for over two centuries without forcing religious non-profits to provide free contraceptive coverage, and has no urgent need to do so now. Indeed, given that the Mandate already contains religious exemptions and other exemptions affecting roughly 90 million individuals, the Government can hardly claim its interests will be unduly harmed by granting temporary relief here.

*Finally*, the public interest is best served by allowing Applicants a full opportunity to seek review from this Court before requiring them to comply with the mandate. Just as "there is the highest public interest in the due observance of all the constitutional guarantees," *United States v. Raines*, 362 U.S. 17, 27 (1960), so too, "pursuant to RFRA, there is a strong public interest in the free exercise of religion." *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1010 (10th Cir. 2014) (per curiam); *see also Hobby Lobby,* 723 F.3d at 1147.

This Court has said that dropping employer health plans altogether is not a "tolerable result." *Hobby Lobby*, 134 S. Ct. 2776-77. And the record shows that would harm Applicants and their employees. *See, e.g.*, *Zubik*, 983 F. Supp. 2d at 590; JA404¶ 34; JA442-43¶ 25. Moreover, the substantial tax penalties to which Applicants will be exposed could severely impede, if not entirely foreclose, the charitable services Applicants provide, leaving a gap in the network of critical social services relied on by many in their communities. *See, e.g.*, JA600:21-601:10 ("Our community of Erie counts on St. Martin Center. . . . It just – it – it isn't something that we could cope with."); JA547:3-25 ("[F]amilies would be in homes that were not heated, no electricity, no lights, emergency food assistance wouldn't be available.");

JA584:9-10 ("As a school with a budget, limited resources, we would close our doors."). This would be destructive not just to Applicants, but to the communities that they serve.

## III.   INJUNCTIVE RELIEF WOULD AID THIS COURT'S JURISDICTION

The foregoing discussion establishes why it is appropriate for this Court to enter an order recalling the Third Circuit's mandate. If this Court instead decides to consider issuing an injunction pending certiorari, the issuance of such an injunction would also be in aid of this court's jurisdiction. *See United States v. U.S. Dist. Ct. for S. Dist. of N.Y.*, 334 U.S. 258, 263 (1948) (the writ power "protects the appellate jurisdiction which might be otherwise defeated and extends to support an ultimate power of review, though it not be immediately and directly involved"). Indeed, this Court recently granted injunctive relief in three similar cases wherein religious believers faced the threat of imminent and irreparable harm. *See Little Sisters*, 134 S. Ct. 1022; *Wheaton*, 134 S. Ct. 2806; *Holt*, 134 S. Ct. 635. For the same reasons, injunctive relief here would be appropriate.

## CONCLUSION

For the foregoing reasons, Applicants respectfully ask this Court to recall the Third Circuit's mandate or, alternatively, enter an injunction pending consideration of Applicants' forthcoming petition for certiorari, to be filed soon after this Application. At the very minimum, the Court should grant a temporary administrative stay to allow full briefing and consideration of this application.

Respectfully submitted,

**April 15, 2015**

_/s/ Paul M. Pohl_

PAUL M. POHL
_Counsel of Record_
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Telephone: (412) 391-3939
pmpohl@jonesday.com

_Counsel to Applicants_

# CERTIFICATE OF SERVICE

As required by Supreme Court Rule 29.5, I, John M. Gore, a member of the

Supreme Court Bar, hereby certify that one copy of the attached Application was

served via electronic mail on April 15, 2015 and by Federal Express on

April 15, 2015 on:

Donald B. Verilli, Jr.
*Solicitor General of the United States*
United States Department of Justice
950 Pennsylvania Ave., NW, Rm. 5614
Washington, DC 20530-0001
(202) 514-2217
SupremeCtBriefs@usdoj.gov

Mark B. Stern
Alisa B. Klein
Adam C. Jed
Patrick G. Nemeroff
Civil Division
U.S. Department of Justice
950 Pennsylvania Ave., NW, Rm. 7240
Washington, DC 20530
(202) 514-8280
Mark.Stern@usdoj.gov
Alisa.Klein@usdoj.gov
Adam.C.Jed@usdoj.gov
patrick.g.nemeroff@usdoj.gov

Date: April 15, 2015

_____
JOHN M. GORE
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
jmgore@jonesday.com

# EXHIBIT B

# Supreme Court of the United States

No.  14A1065

MOST REVEREND DAVID A. ZUBIK, ET AL.,

Applicants

v.

SYLVIA BURWELL, SECRETARY OF HEALTH AND HUMAN SERVICES, ET AL.

_____

**O R D E R**
_____

UPON CONSIDERATION of the application of counsel for the applicants,

IT IS ORDERED that the mandate of the United States Court of Appeals for the Third Circuit, case Nos. 14-1376 & 14-1377, issued April 15, 2015, is hereby recalled and stayed pending receipt of a response, due on or before April 20, 2015, and further order of the undersigned or of the Court.

_____/s/   Samuel A. Alito, Jr._____
Associate Justice of the Supreme
Court of the United States

Dated this 15th
day of April, 2015.

# EXHIBIT C

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 14-1376

MOST REVEREND LAWRENCE T. PERSICO, et al.

v.

SECRETARY OF UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES, et al.,
Appellants

(W.D. Pa. 1-13-cv-00303)

No. 14-1377

MOST REVEREND DAVID A. ZUBIK, et al.

v.

SECRETARY OF UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES; et al.,
Appellants

(W.D. Pa. No. 2-13-cv-01459)

**ORDER**

By order entered April 15, 2015, the Supreme Court of the United States order that the mandate issued by the Third Circuit Court of Appeals be recalled and stayed pending receipt of a response and further order of the Supreme Court.

In accordance with this directive, it is hereby O R D E R E D that the mandate in this matter is hereby recalled.

For the Court,

*Marcia M. Waldron*

Marcia M. Waldron, Clerk
Date: April 16, 2015
tmm/cc: all counsel of record

# Supreme Court of the United States

No.    14A1065

MOST REVEREND DAVID A. ZUBIK, ET AL.,

Applicants

v.

SYLVIA BURWELL, SECRETARY OF HEALTH AND HUMAN SERVICES,
ET AL.

—————————

**O R D E R**
—————————

UPON CONSIDERATION of the application of counsel for the

applicants,

IT IS ORDERED that the mandate of the United States Court of

Appeals for the Third Circuit, case Nos. 14-1376 & 14-1377, issued April 15,

2015, is hereby recalled and stayed pending receipt of a response, due on or

before April 20, 2015, and further order of the undersigned or of the Court.

_____/s/    Samuel A. Alito, Jr._____
Associate Justice of the Supreme
Court of the United States

Dated this 15th
day of April, 2015.

# EXHIBIT D

No. _____

# IN THE SUPREME COURT OF THE UNITED STATES

GENEVA COLLEGE,

*Applicant,*

v.

SYLVIA M. BURWELL, in her official capacity as Secretary of the United States Department of Health and Human Services, *et al.*,

*Respondents.*

**Application from the U.S. Court of Appeals for the Third Circuit (Nos. 13-3536 & 14-1374)**

**EMERGENCY APPLICATION TO RECALL AND STAY MANDATE OR ISSUE INJUNCTION PENDING RESOLUTION OF CERTIORARI PETITION**

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road, NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774

Gregory S. Baylor
  *Counsel of Record*
Matthew S. Bowman
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690

Kevin H. Theriot
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020

Bradley S. Tupi
David Mongillo
1500 One PPG Place
Pittsburgh, PA 15222
(412) 594-5545

*Attorneys for Applicant*

## PARTIES TO THE PROCEEDINGS

The Applicant is Geneva College. Geneva College is a Christ-centered institution of higher learning located in Beaver Falls, Pennsylvania. It is a Pennsylvania not-for-profit corporation.

The Respondents are the following:

- The United States Department of Health and Human Services

- Sylvia Mathews Burwell in her official capacity as Secretary of the United States Department of Health & Human Services

- The United States Department of Labor

- Thomas E. Perez in his official capacity as Secretary of the United States Department of Labor

- The United States Department of the Treasury

- Jacob J. Lew in his official capacity as Secretary of the United States Department of the Treasury

**RULE 29.6 STATEMENT**

As required by Supreme Court Rule 29.6, the Applicant hereby submits the following corporate disclosure statement.

1. The Applicant does not have a parent corporation.

2. No publicly held corporation owns any portion of any of the Applicant, and the Applicant is not a subsidiary or an affiliate of any publicly owned corporation.

Date: April 17, 2015

/s/ Gregory S. Baylor
Gregory S. Baylor
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690

# TABLE OF CONTENTS

PARTIES TO THE PROCEEDINGS .............................................................. i

RULE 29.6 STATEMENT ........................................................................... ii

INDEX OF APPENDICES ......................................................................... iv

TABLE OF AUTHORITIES ........................................................................ v

OPINIONS BELOW .................................................................................. 4

JURISDICTIONAL STATEMENT .............................................................. 4

STATEMENT OF THE CASE ..................................................................... 4

REASONS FOR GRANTING THE APPLICATION .................................... 11

I.    THE COLLEGE HAS A CLEAR RIGHT TO RELIEF UNDER RFRA OR A "REASONABLE PROBABILITY" OF CERTIORARI AND A "FAIR PROSPECT" OF REVERSAL. ........................................... 11

II.    THE EQUITIES FAVOR RECALLING THE MANDATE OR, IN THE ALTERNATIVE, AN INJUNCTION PENDING CERTIORARI. ................... 16

III.    INJUNCTIVE RELIEF WOULD AID THIS COURT'S JURISDICTION. ........................................................................... 16

CONCLUSION ......................................................................................... 17

CERTIFICATE OF SERVICE .................................................................... 18

**INDEX OF APPENDICES**

Appendix A:      Third Circuit Merits Opinion

Appendix B:      Order Denying Petition for Rehearing and Rehearing En Banc

Appendix C:      Order Issuing the Mandate

Appendix D:      District Court Opinion Accompanying Order Granting Preliminary Injunction for Student Plan

Appendix E:      District Court Opinion Accompanying Order Granting Preliminary Injunction for Employee Plan

# TABLE OF AUTHORITIES

*Cases*:

*Burwell v. Hobby Lobby Stores,*
  134 S. Ct. 2751 (2014) ...................................................................... 11

*Hobby Lobby Stores v. Sebelius,*
  723 F.3d 1114 (10th Cir. 2013) (en banc) ........................................ 13

*Korte v. Sebelius,*
  735 F.3d 654 (7th Cir. 2013) ............................................................ 13

*Larson v. Valente,*
  456 U.S. 228 (1982) ..................................................................... 9, 10

*Little Sisters of the Poor v. Sebelius,*
  134 S. Ct. 893 (2013) ......................................................................... 3

*Michigan Catholic Conf. v. Burwell,*
  755 F.3d 372 (6th Cir. 2014) ............................................................ 12

*Univ. of Notre Dame v. Sebelius,*
  743 F.3d 547 (7th Cir. 2014) ............................................................ 12

*Wheaton Coll. v. Burwell,*
  134 S. Ct. 2898 (2014) ....................................................................... 3


*Statutes*:

26 U.S.C. § 6033(a) ........................................................................... 8, 9

26 U.S.C. § 4980D ............................................................................... 10

42 U.S.C. § 300gg-13 ............................................................................. 7

42 U.S.C. § 2000bb ......................................................................... 11, 13


*Regulations*:

26 C.F.R. § 1.6033-2 .............................................................................. 8

26 C.F.R. § 54.9815-2713A .................................................................... 7

29 C.F.R. § 2590-2713A ............................................................................... 7

45 C.F.R. § 147.130 ................................................................................. 7, 8

78 Fed. Reg. 39,870 .................................................................................... 9

### *Other Authorities*:

Guttmacher Inst., *Insurance Coverage of Contraceptives*,
http://www.guttmacher.org/statecenter/spibs/spib_ICC.pdf ...................................... 15

Guttmacher Inst., State Data Center,
http://www.guttmacher.org/datacenter/profile.jsp ...................................... 15

Institute of Medicine, *Clinical Preventive Services for Women: Closing the
Gaps*, National Academies Press (2011),
http://books.nap.edu/openbook.php?record_id=13181 ................................. 14

James Trussell & Elizabeth G. Raymond, *Emergency Contraception: A Last
Chance to Prevent Unintended Pregnancy*,
http://ec.princeton.edu/questions/ec-review.pdf ......................................... 14

Kathryn Kost, Unintended Pregnancy Rates at the State Level: Estimates
for 2002, 2004, 2006 and 2008 (Guttmacher Institute, September 2013) ................. 15

Lawrence B. Finer & Mia R. Zolna, *Unintended Pregnancy in the United
States: Incidence and Disparities, 2006*, 84 CONTRACEPTION (2011) ....................... 15

Nat'l Conference of State Legislatures, *Insurance Coverage for Contraception
Laws*, http://www.ncsl.org/issues-research/health/insurance-coverage-for-
contraception-state-laws.aspx .................................................................. 15

TO THE HONORABLE SAMUEL A. ALITO, JR., ASSOCIATE JUSTICE OF THE UNITED STATES AND CIRCUIT JUSTICE FOR THE THIRD CIRCUIT:

Applicant Geneva College seeks an emergency recall and stay of the Third Circuit's mandate to keep in place the district court's preliminary injunctions and to maintain the status quo while it seeks a writ of certiorari from this Court. In the alternative, the College requests injunctive relief pending its forthcoming petition for a writ of certiorari or, at least, a temporary administrative stay to allow for full briefing on this Application. Without such relief, the College will be forced by the Government to choose now between transgressing its religious beliefs and incurring unsustainable financial penalties.

This Court has already ordered that the mandate of the Third Circuit in *Zubik* and *Persico*, case Nos. 14-1376 &14-1377, issued April 15, 2015, be recalled and stayed pending receipt of a response from the Government and further order of the Circuit Justice or of the Court. *Zubik v. Burwell*, No. 14A1065 (Apr. 15, 2015). The Government's appeals of the district court injunctions granted to the College were consolidated at the Third Circuit with the Government's appeals in *Zubik* and *Persico*, and the Court of Appeals' opinion addressed all the consolidated appeals. The College respectfully submits that there is no plausible basis for withholding the same relief received by the Applicants in No. 14A1065.

The College is a religious non-profit institution of higher education. It cannot, consistent with its sincerely held religious beliefs, provide, pay for, or facilitate access to abortifacients. The College hereby requests emergency relief to prevent the Government from forcing it to comply with regulations requiring it to

violate these beliefs. Specifically, the regulations would require the College (1) to execute and convey the self-certification form designating and authorizing third parties to provide the objectionable coverage through the College's employee and student health plans, and (2) maintain a contractual relationship with those third parties, keeping open the conduit through which the objectionable drugs and devices are delivered. The College's religious beliefs prohibit the required actions. If they refuse, they will incur potentially ruinous fines.

On June 18, 2013, the United States District Court for the Western District of Pennsylvania granted the College's motion for preliminary injunction, thereby protecting the health plan Geneva makes available to its students. App. D. On December 23, 2013, the district court granted the College's motion for preliminary injunction regarding its employee health plan. App. E.

On February 11, 2015, a Third Circuit panel reversed the district court decisions in the instant case—and in *Zubik* and *Persico*—concluding that the plaintiffs were not likely to succeed on the merits of their Religious Freedom Restoration Act (RFRA) claims. App. A. The panel's analysis and conclusion rested heavily upon the Seventh Circuit's decision in *University of Notre Dame v. Sebelius*, 743 F.3d 547 (7th Cir. 2014). On March 9, 2015, this Court granted certiorari, vacated, and remanded that Seventh Circuit decision. *Univ. of Notre Dame v. Burwell*, 135 S. Ct. 1528 (Mar. 9, 2015). Like the plaintiffs in *Zubik* and *Persico*, the College sought *en banc* review. On April 13, 2015, the Third Circuit denied the College's petition for rehearing. On April 15, 2015, the Third Circuit denied the

motion to stay issuance of the mandate in *Zubik* and *Persico*, and issued the mandate immediately. Although Federal Rule of Appellate Procedure 41(b) indicates that mandates will customarily issue "7 days after entry of an order denying a timely petition for panel rehearing, petition for rehearing en banc, or motion for stay of mandate, whichever is later," Fed. R. App. P. 41(b), the Third Circuit issued the mandate in the College's case a mere two days after denying its rehearing petition, before it could file its intended motion to stay issuance of the mandate. (Given the Third Circuit's denial of the motion to stay filed by the plaintiffs in *Zubik* and *Persico*, it is clear that the court would have denied the College's motion to stay as well.)

Without relief from this Court, the College will thus be forced to choose now between violating its religious convictions or incurring significant financial penalties. The College requests that this Court recall the Third Circuit's mandate to prevent this irreparable harm, allowing the district court's preliminary injunctions to remain in effect. In the alternative, the College asks that the Court enjoin application of the challenged regulations pending consideration of its forthcoming petition for a writ of certiorari or, as in *Zubik* and *Persico*, issue a temporary administrative stay to allow for full briefing and consideration of this Application. *See Zubik*, No. 14A1065 (Apr. 15, 2015); *Wheaton College v. Burwell*, 134 S. Ct. 2898 (2014); *Little Sisters of the Poor v. Sebelius*, 134 S. Ct. 893 (2013) (Sotomayor, J., in chambers).

## OPINIONS BELOW

The district court's opinion granting the College's motion for preliminary injunction regarding the student plan is attached as Appendix D. The district court's opinion granting the College's motion for preliminary injunction regarding the employee plan is attached as Appendix E. The Third Circuit's merits opinion is attached as Appendix A, and its order denying the College's petition for rehearing and rehearing en banc is attached as Appendix B.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. The Court of Appeals had jurisdiction under 28 U.S.C. § 1292(a)(1). This Court has jurisdiction under 28 U.S.C. §§ 1254(1) and 2101(f).

## STATEMENT OF THE CASE

A.    <u>Geneva College's Religious Identity</u>

The Applicant is a Christ-centered institution of higher learning. It believes that God has condemned the intentional destruction of innocent human life. The College holds, as a matter of religious conviction, that it would be sinful and immoral for it intentionally to participate in, pay for, facilitate, enable, or otherwise support access to abortion, which destroys human life. It holds that one of the prohibitions of the Ten Commandments ("thou shalt not murder") precludes it from facilitating, assisting in, or enabling the use of drugs or devices that can and do destroy very young human beings in the womb.

Geneva College was established in 1848 by the Reformed Presbyterian Church of North America (RPCNA). The College's mission is to glorify God by

educating and ministering to a diverse community of students in order to develop servant-leaders who will transform society for the kingdom of Christ. The College pursues this mission through biblically-based programs and services anchored in the historic, evangelical, and Reformed Christian faith. The vocationally-focused curriculum is rooted in the liberal arts and sciences and is delivered through traditional and specialized programs. Central to the mission of Geneva College is its desire to glorify God. The College believes that the Bible teaches that the lives of all people (especially followers of Jesus Christ) should glorify God.

The College's Board of Trustees must be members of either the RPCNA or other Reformed and Evangelical Christian congregations. Geneva draws its faculty, staff, and administration from among those who profess faith in Christ and otherwise agree with the College's Christian convictions, including its convictions about the sanctity and dignity of human life. The College gives priority in its student recruitment to the evangelical Christian community and seeks to create a Christian peer influence among students. All students are expected to live by the standards of historic Christian morality, including those expressed in the Ten Commandments.

The RPCNA Testimony, one articulation of the Church's religious beliefs, declares as follows: "Unborn children are living creatures in the image of God. From the moment of conception to birth they are objects of God's providence as they are being prepared by Him for the responsibilities and privileges of postnatal life. Unborn children are to be treated as human persons in all decisions and actions

involving them. Deliberately induced abortion, except possibly to save the mother's life, is murder." In support of this declaration, the Testimony cites Exodus 20:13 ("thou shalt not murder"), Exodus 21:22-23, and Psalm 139:13-16.

Geneva College unreservedly shares the RPCNA's religious views regarding abortion, believing that the procurement, participation in, facilitation of, or payment for abortion (including abortion-causing drugs like Plan B and ella) violates the Commandment against murder (and the interpretation of that Commandment in the Westminster Larger Catechism, another articulation of the Church's beliefs) and is inconsistent with the dignity conferred by God on creatures made in His image.

B.    The College's Health Insurance Plans

To fulfill its religious commitments and duties in the Christ-centered educational context, the College promotes the spiritual and physical well-being and health of its employees and students. This includes the provision of generous health insurance to employees and their dependants and the facilitation of a student health plan. Consistent with its religious beliefs about the sanctity of life, the College's contract for employee health coverage states that it excludes "[a]ny drugs used to abort a pregnancy."

The College requires that all full-time undergraduate students carry health insurance. If a student does not provide the College information about his or her health insurance coverage, the student will be enrolled in the College's UnitedHealthcare Plan. Full-time graduate students may enroll in the College's

UnitedHealthcare Plan on a voluntary basis. The College's religious convictions prevent it from facilitating student health insurance coverage that enables or facilitates access to ella, Plan B, or IUDs.

C.  The Affordable Care Act and the HHS Mandate

The College incorporates by reference the description of the Patient Protection and Affordable Care Act and the HHS Mandate set forth by the Applicants in *Zubik*, No. 14A1065. (Application, pp. 4-8).

The so-called "accommodation"[1] does not absolve eligible[2] religious organizations of their obligation to obey the Mandate. The relevant statutory provision declares that "[a] group health plan and a health insurance issuer offering group or individual health insurance coverage *shall*, at a minimum *provide coverage for* and shall not impose any cost sharing requirements for . . . with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration." 42 U.S.C. § 300gg-13(a)(4) (emphasis added). The Department of Health and Human Services reiterated this statutory requirement in a regulation. *See* 45 C.F.R. § 147.130(a)(1)(iv).

The accommodation states as follows:

---

[1] 26 C.F.R. § 54.9815-2713A (Department of the Treasury); 29 C.F.R. § 2590-2713A (Department of Labor); 45 C.F.R. § 147.131(b) (Department of Health and Human Services).
[2] The eligibility criteria are set forth in 45 C.F.R. § 147.131(b). But for its unwillingness to convey an executed self-certification form to the issuers of its employee and student health insurance plans, the College is eligible for the accommodation.

> A group health plan established or maintained by an eligible
> organization that provides benefits through one or more group
> health insurance issuers *complies* for one or more plan years
> *with any requirement under § 147.130(a)(1)(iv) to provide
> contraceptive coverage* if the eligible organization or group
> health plan furnishes a copy of the self-certification . . . to each
> issuer . . . .

45 C.F.R. § 147.131(c) (emphasis). This is not an exemption, but an alternative compliance mechanism. The College is the one that "established" and "maintain[s]" its group health plans, through which abortifacient access is provided. Through the accommodation, it "complies for one or more plan years with" the statutory requirement reiterated in the relevant administrative rule. The College can comply with the Mandate either by directly including objectionable abortifacients in its employee and student health insurance plans or by executing and delivering self-certification forms to its insurers (or the Secretary of Health and Human Services), thereby accomplishing the same morally objectionable result. Either way, the College is complicit in the provision and use of abortifacients, both as a matter of fact and as a matter of its moral theology.

The Government exempts certain religious organizations from the Mandate. 45 C.F.R. § 147.131(a). To receive the exemption's protection, an entity must be one "that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code." *Id*. Those Code sections refer to "churches, their integrated auxiliaries,[3] and conventions or associations or

---

[3] 26 C.F.R. § 1.6033-2(a), (g), and (h). For an entity to be an integrated auxiliary, it must be "[a]ffiliated with a church or a convention or association of churches" and be "[i]nternally supported." *Id*. § 1.6033-2(h)(ii) and (iii). The College is apparently

churches" and "the exclusively religious activities of any religious order." 26 U.S.C. § 6033(a)(3)(A)(i) and (iii). The Government justifies this narrow exemption as follows:

> The Departments believe that the simplified and clarified definition of religious employer continues to respect the religious interests of houses of worship and their integrated auxiliaries in a way that does not undermine the governmental interests furthered by the contraceptive coverage requirement. Houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people of the same faith who share the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under the plan.

"Coverage of Certain Preventive Services Under the Affordable Care Act," 78 Fed. Reg. 39,870, 39,874 (July 2, 2013).

In essence, the Government is conceding that the Mandate does *not* advance any compelling interest when applied to employers who employ employees who share their religious convictions—a category that includes the College. Geneva draws its faculty, staff, and administration from among those who profess faith in Christ and otherwise agree with the College's Christian convictions. And it gives priority in its student recruitment to the evangelical Christian community and seeks to create a Christian peer influence among students. All students are expected to live by the standards of historic Christian morality, including those

---

ineligible for integrated auxiliary status (and thus for the Mandate's exemption) primarily because it receives the majority of its revenue from "external" sources (*i.e.*, tuition paid by students and their families) rather than an "internal" one (*i.e.*, an affiliated church). *Cf. Larson v. Valente*, 456 U.S. 228 (1982) (invalidating state statute differentiating among religious organizations based upon their source of income).

expressed in the Ten Commandments. Using abortifacients violates the College's Christian convictions and standards of morality applicable to faculty, staff, and students. Given this, the Government's unwillingness to extend the exemption to the College is arbitrary, irrational, and unfair.

Failure to follow either mechanism for complying with the Mandate results in enormous financial penalties. If a health plan does not cover all the required items, the plan sponsor is subject to penalties of $100 per day per affected beneficiary. 26 U.S.C. § 4980D(b). Dropping employee health insurance would expose the College to substantial penalties ($2,000 per year per employee after the first 30); while dropping student health insurance would contradict the College's religious obligation to provide for the well-being of its students.

D.   Procedural History

The College filed suit on February 21, 2012, challenging application of the Mandate to its employee and student health plans. On June 18, 2013, the district court granted the College's motion for preliminary injunction regarding its student health insurance plan. On August 17, 2013, the Government filed its Notice of Appeal as to the district court's June 18, 2013, preliminary injunction.

On December 23, 2013, the district court granted the College's motion for preliminary injunction regarding its employee health insurance plan. The Government filed its Notice of Appeal as to this order on February 11, 2014.

On April 2, 2014, at the Government's request, the Third Circuit consolidated these appeals with the Government's appeals in *Zubik* and *Persico*. On February

11, 2015, a Third Circuit panel, in a single opinion, reversed the district court's rulings in all the cases on appeal. The College timely sought panel rehearing and rehearing *en banc*. Its petition was denied on April 13, 2015. Despite Federal Rule of Appellate Procedure 41(b), the Third Circuit issued its mandate two days later, on April 15, 2015.

## REASONS FOR GRANTING THE APPLICATION

In their Application, the plaintiffs in *Zubik* and *Persico* accurately and adequately set forth the authority of a Circuit Justice to grant the requested relief. (Application, No. 14A1065, pp. 11-12). The College incorporates by reference that discussion.

## I. THE COLLEGE HAS A CLEAR RIGHT TO RELIEF UNDER RFRA OR A "REASONABLE PROBABILITY" OF CERTIORARI AND A "FAIR PROSPECT" OF REVERSAL.

The HHS Mandate violates the College's rights protected by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq*. Under the approach set forth by this Court in *Burwell v. Hobby Lobby*, 134 S. Ct. 2751 (2014), the Mandate substantially burdens the College's religious exercise by imposing substantial pressure upon it to perform acts contrary to its religious convictions. 42 U.S.C. § 2000bb-1(a). And application of the Mandate to the College is not the least restrictive means of advancing a compelling governmental interest. *Id*. at 2000bb-1(b).

A.  <u>The Mandate Substantially Burdens the College's Religious Exercise</u>.

The Third Circuit's conclusion that the Mandate does not substantially burden the College's religious exercise is inconsistent with this Court's reasoning in *Hobby Lobby*.  Accordingly, there is both a "reasonable probability" that this Court will grant the College's forthcoming petition for certiorari and a "fair prospect" of reversal.  In their Application, the plaintiffs in *Zubik* and *Persico* thoroughly set forth, with reasons equally applicable to Geneva College, the rationale behind these assertions.  (Application, No. 14A1065, pp. 12-35).  The College thus incorporates by reference the arguments set forth in the *Zubik* Application, and asks that the Court preserve the status quo pending resolution of its forthcoming certiorari petition.

The College wholeheartedly agrees with the *Zubik* Application's observation that the Third Circuit's decision contradicts *Hobby Lobby*.  (Application, No. 14A1065, pp. 21-26).  In *Hobby Lobby*, this Court resolved an ongoing debate about how courts should undertake RFRA's "substantial burden" inquiry.  The Government had argued, and certain courts accepted, the notion that judges are free to assess the "directness" of the causal connection between (a) what the Government is pressuring the claimant to do, and (b) the immoral act that it does not wish to facilitate.  Those accepting this approach included the dissent in *Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013) (Rovner, J., dissenting); the majority in *Univ. of Notre Dame v. Burwell*, 743 F.3d 547 (7th Cir. 2014); and the panel in *Michigan Catholic Conf. v. Burwell*, 755 F.3d 372 (6th Cir. 2014).

Mandate challengers and other courts disagreed, arguing that a government rule "substantially burdens" religious exercise if it imposes substantial pressure

upon a claimant to engage in acts contrary to its religious convictions. *See Korte v. Sebelius*, 735 F.3d 654; *Hobby Lobby Stores v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) (en banc). The Third Circuit essentially sidestepped this Court's resolution of that debate. As noted in the *Zubik* Application, the panel relied heavily upon the now-vacated Seventh Circuit opinion in *Notre Dame* and upon the discredited dissent in *Korte*. Accordingly, there is a "fair prospect" that this Court will reverse the Third Circuit's decision if and when it grants the College's certiorari petition.

B.  <u>Application of the Mandate to the College Does Not Further a Compelling Government Interest</u>.

The Government's contention that the Mandate furthers a compelling governmental interest is defective for the reasons set forth in the *Zubik* Application. (Application, No. 14A1065, pp. 26-31). Forcing the College to facilitate access to abortifacients is particularly unjustified. As noted above, the College draws its workforce and student body from among those who share its religious convictions, including its pro-life beliefs. Through the religious exemption, the Government itself has conceded that imposing the Mandate upon such organizations is pointless. Although the College undeniably satisfies the Government's rationale for the exemption, the Government nonetheless withheld that protection from the College. Any suggestion that the injunctions must be lifted immediately in order to give members of the College community coverage of unwanted abortifacients is simply untenable. *See* 42 U.S.C. § 2000bb-1(b) (requiring the Government to prove that the "application of the burden *to the person*" (emphasis added)).

The Government claims that the Mandate will reduce the number of unintended pregnancies and thus the adverse health events allegedly caused by the unintended nature of some pregnancies. Of course, the relevant question in the instant case is whether forcing the College to provide access to four abortifacients to its employees and students will advance that goal. The Government has failed to carry its burden on this question. Princeton University's Office of Population Research concluded that "no published study has yet demonstrated that increasing access to ECPs [emergency contraceptives like the morning-after and week-after pills to which the College objects] reduces pregnancy or abortion rates in a population." James Trussell & Elizabeth G. Raymond, *Emergency Contraception: A Last Chance to Prevent Unintended Pregnancy*, available at http://ec.princeton.edu/questions/ec-review.pdf, at 15 (last visited Apr. 16, 2015).

More broadly, there is scant evidence that providing cost-free access even to *conventional* contraceptives reduces unintended pregnancies. The Institute of Medicine (IOM) report on which HHS relied in crafting the Mandate[4] fails to demonstrate that forcing employers to cover FDA-approved contraceptives will actually reduce the number and percentage of unintended pregnancies—and thus the adverse health events that may (or may not) be attributable to the unintended nature of the pregnancy. The IOM report observes that private health insurance coverage of contraceptives had increased since the 1990s. IOM Report at 109. If

---

[4] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps*, National Academies Press (2011), available at http://books.nap.edu/openbook.php?record_id=13181 (last visited Apr. 16, 2015).

insurance coverage of contraceptives were truly the key to reducing unintended pregnancies—as the Mandate presupposes—then one would have expected the rate of such pregnancies to decline as insurance coverage rose. But it did not.[5]

State-specific research data conclusively proves that contraceptive mandates do not substantially ameliorate the unintended pregnancy problem. Over two dozen states have adopted laws requiring group health plans to include contraceptives.[6] Yet these states experience rates of unintended pregnancy that are actually *higher* than in the states without such mandates. In the states with mandates, the average rate of unintended pregnancies in 2006 was 52.58%; the average rate in states without mandates in 2006 was 50.38%.[7] Data showing the unintended pregnancy rates both before and after the adoption of a state mandate is available for seven states. In five of those states (Arkansas, New Mexico, Oregon, Washington, and West Virginia), the unintended pregnancy rate actually *increased* following the adoption of a contraceptive mandate.[8] Plainly, contraceptive

---

[5] *See, e.g.*, Lawrence B. Finer & Mia R. Zolna, *Unintended Pregnancy in the United States: Incidence and Disparities, 2006*, 84 CONTRACEPTION at 478–85 (2011).

[6] *See* Nat'l Conference of State Legislatures, *Insurance Coverage for Contraception Laws*, http://www.ncsl.org/issues-research/health/insurance-coverage-for-contraception-state-laws.aspx (last visited Apr. 16, 2015); Guttmacher Inst., *Insurance Coverage of Contraceptives*, http://www.guttmacher.org/statecenter/spibs/spib_ICC.pdf (last visited Apr. 16, 2015).

[7] The Guttmacher Institute maintains and publishes a "reproductive health profile" for each of the 50 states. *See* Guttmacher Inst., State Data Center, http://www.guttmacher.org/datacenter/profile.jsp (last visited Apr. 17, 2015). Each state's profile includes the percentage of pregnancies in 2006 that were unintended. *See also* Kathryn Kost, Unintended Pregnancy Rates at the State Level: Estimates for 2002, 2004, 2006 and 2008 (Guttmacher Institute, September 2013).

[8] Kost, Unintended Pregnancy Rates.

mandates are not an effective means of noticeably diminishing unintended pregnancies.

Accordingly, the Government cannot plausibly argue that forcing the College violate its religious beliefs by facilitating access to abortifacients is the least restrictive means of advancing a compelling interest.

## II.   THE EQUITIES FAVOR RECALLING THE MANDATE OR, IN THE ALTERNATIVE, AN INJUNCTION PENDING CERTIORARI.

In their Application, the *Zubik* and *Persico* plaintiffs explain why the equities point towards granting relief.  (Application, No. 14A1065, pp. 35-38).  The reasons articulated there apply equally to the College.  It will suffer irreparable harm by being forced to choose between violating its beliefs and incurring enormous fines. As noted by the *Zubik* Application, the harm imposed upon Mandate challengers like the College far outweighs any harm to the Government or to the public interest that might flow from granting relief.

## III.   INJUNCTIVE RELIEF WOULD AID THIS COURT'S JURISDICTION.

The College agrees with and hereby incorporates by reference the *Zubik* Application's argument that an injunction pending certiorari would be in aid of this Court's jurisdiction.  (Application, No. 14A1065, p. 38).

## CONCLUSION

Geneva College respectfully requests that this Court recall the Third Circuit's mandate or, in the alternative, enter an injunction pending consideration of the College's forthcoming petition for certiorari. At the very least, this Court should grant a temporary administrative stay to permit full briefing and consideration of this Application.

Dated: April 17, 2015     Respectfully submitted,

             */s/ Gregory S. Baylor*
             Gregory S. Baylor
             Matthew S. Bowman
             ALLIANCE DEFENDING FREEDOM
             440 First Street, NW, Suite 600
             Washington, DC 20001
             (202) 393-8690

             David A. Cortman
             ALLIANCE DEFENDING FREEDOM
             1000 Hurricane Shoals Road, NE
             Suite D-1100
             Lawrenceville, GA 30043
             (770) 339-0774

             Kevin H. Theriot
             ALLIANCE DEFENDING FREEDOM
             15100 N. 90th Street
             Scottsdale, AZ 85260
             (913) 685-8000

             Bradley S. Tupi
             David Mongillo
             1500 One PPG Place
             Pittsburgh, PA 15222
             (412) 594-5545

             *Attorneys for Applicant*

## CERTIFICATE OF SERVICE

As required by Supreme Court Rule 29.5, I, Gregory S. Baylor, a member of the Supreme Court Bar, hereby certify that one copy of the attached Application was served via electronic mail on and by Federal Express on April 17, 2015 on:

Donald B. Verilli, Jr.
*Solicitor General of the United States*
United States Department of Justice
950 Pennsylvania Ave., NW, Rm. 5614
Washington, DC 20530-0001
(202) 514-2217
SupremeCtBriefs@usdoj.gov

Mark B. Stern
Alisa B. Klein
Adam C. Jed
Patrick G. Nemeroff
Civil Division
U.S. Department of Justice
950 Pennsylvania Ave., NW, Rm. 7240
Washington, DC 20530
(202) 514-8280
Mark.Stern@usdoj.gov
Alisa.Klein@usdoj.gov
Adam.C.Jed@usdoj.gov
Patrick.G.Nemeroff@usdoj.gov

Date: April 17, 2015

Gregory S. Baylor
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(202) 393-8690
gbaylor@alliancedefendingfreedom.org

18